## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

William Jalowiec,                                        Civil No. 14-4332 (DWF/LIB)

                    Plaintiff,

v.                                                      **MEMORANDUM**
                                                    **OPINION AND ORDER**

Aetna Life Insurance Company,

                    Defendant.

---

KrisAnn Norby-Jahner, Esq., Brian R. Christiansen, Esq., and Denise Yegge Tataryn, Esq., Hellmuth & Johnson PLLC, counsel for Plaintiff.

Eric P. Mathisen, Esq., Colton D. Long, Esq., and Hal A. Shillingstad, Esq., Ogletree, Deakins, Nash, Smoak & Stewart, PC, counsel for Defendant.

---

### INTRODUCTION

This matter is before the Court on cross-motions for summary judgment brought by Plaintiff William Jalowiec ("Jalowiec") (Doc. No. 27) and Defendant Aetna Life Insurance Company ("Aetna") (Doc. No. 23). For the reasons stated below, the Court grants Plaintiff's motion in part and denies Defendant's motion.

### BACKGROUND

In November 2006, Jalowiec was hired as a Design Documentation Control ("DDC") Supervisor at TEAM Industries, Inc. ("Team Industries"). (Doc. No. 33, Declaration of Lina M. Camacho ("Camacho Decl.") ¶ 8, Ex. B (Administrative Record ("AR")) at 36, 392-93.) In this position, Jalowiec supervised employees, coordinated

employee efforts to maintain consistency of processes, resolved problems, and provided technical advice.  (AR at 392.)  In February 2012, Jalowiec ended his employment at Team Industries due to the onset of daily debilitating headaches that "impacted [his work duties] to a very large degree."  (AR at 36, 481.)

Prior to the onset of this disabling condition, Jalowiec enjoyed boating, yard work, attending school events, camping, exercising, and Tae Kwon Do.  (AR at 37.)  After the condition began, however, Jalowiec was rarely able to engage in these activities due to pain and the effects of his medications.  (*Id.*)  Jalowiec sought short-term disability ("STD") and long-term disability ("LTD") benefits under a plan sponsored by his employer and underwritten by Aetna.  (*See* Camacho Decl. ¶ 6, Ex. A (Plan Documents ("PD")) at 2, 29; AR at 293.)  Although Aetna awarded Jalowiec STD benefits (AR at 293), it denied Jalowiec's claim for LTD benefits (AR at 778-80).  Jalowiec now challenges Aetna's denial under the Employee Retirement Income Security Act of 1974 ("ERISA").

## I.     Jalowiec's Position at Team Industries

As a DDC Supervisor at Team Industries, Jalowiec was responsible for supervising a group of personnel, coordinating employees to maintain consistent processes, providing direction to employees in their daily assignments, and ensuring the integrity of CAD models and component prints to meet defined standards.  (*See* AR at 392.)  His duties included coordinating and facilitating staff training, providing feedback, reviewing and writing reports, coordinating recruitment of new employees, and conferring with peers to solve problems and provide technical advice.  (*See id.*)  Other

duties identified by his employer included design/print review meetings, conducting

presentations at Design and Drafting "Best Practices" meetings, attending to designer and

drafter problems on a daily basis at various work stations in the department, traveling to

colleges for recruitment presentations, traveling to required software conferences,

presenting training to groups in various Team Industries locations, and leading the

interview process for prospective new drafters.  (AR at 1280.)  Jalowiec's job description

listed the following "Essential Functions" of the job:

- Communicates appropriately by listening to others, processes information, and communicates effectively . . .
- Must be able to frequently lift up to 25 pounds and occasionally up to 50 pounds.
- Capable of riding ATV's, snowmobiles, motorcycles, tractors, etc.
- Write reports and effectively present information to teams and/or supervisor. . .
- Occassional [sic] travel required
- Must be able to sit and work while modeling up to 8 hours per day

(AR at 393.)  In a work history questionnaire completed for Aetna, Jalowiec noted that he

worked a ten-hour work day, sat eight hours per day, stood one hour per day, and walked

one hour per day.  (AR at 36.)  He indicated that his position required him to bend/stoop,

crawl, reach above his shoulders, kneel, push/pull, and lift up to 50 pounds or more

occasionally.  (*Id.*)

## II.     The Plan

Jalowiec's employment with Team Industries entitled him to certain benefits,

including short-term and long-term disability insurance.  Team Industries' group

long-term disability plan ("LTD Plan") is underwritten by Aetna, and is governed by

ERISA.  (*See* PD at 2, 29, 56.)  The LTD Plan provides, in relevant part:  "This Plan will pay a Monthly Benefit for a period of total disability caused by a disease or accidental bodily injury."  (PD at 3.)  The LTD Plan then provides the following definition of total disability:  "You are deemed to be totally disabled if you are not able, solely because of injury or disease, to perform the material duties of your own occupation. . . ."  (*Id.*)  The LTD Plan clarifies this provision, stating:

> You will not be deemed to be performing the material duties of your own occupation or working at a reasonable occupation on any day if:
>
> - you are performing at least one, but not all, of the material duties of your own occupation or you are working at any occupation (full-time or part-time); and
> - solely due to disease or injury, your income from either is 80% or less of your adjusted predisability earnings.

(*Id.*)  The LTD Plan provides a list of circumstances under which a period of total disability will be deemed to end, including the following relevant provisions:

- The date you are not totally disabled. . . .
- The date you fail to give proof that you are still totally disabled.

(PD at 4.)  Under a provision labeled, "How and When To Report Your Claim," the LTD Plan states, "[y]our claim must give proof of the nature and extent of the loss."  (PD at 14.)  In addition, the LTD Plan states, "Aetna may require copies of documents to support your claim," and "[y]ou must furnish such true and correct information as Aetna may reasonably request."  (*Id.*)

## III.   Jalowiec's Medical History

In February 2011, Jalowiec was involved in a Tae Kwon Do event during which he suffered a "blow to the back of his head."  (AR at 381.)  Jalowiec's medical

difficulties began around this same time when he began experiencing chronic headaches coupled with symptoms of dizziness.  (AR at 379.)  During a July 2011 visit to his primary care clinic, Corinne Dargus, A.P.R.N., B.C., P.A.-C ("Dargus") described Jalowiec's "[c]hronic problems with insomnia and fatigue as well as headaches."  (AR at 425.)  Dargus noted that Jalowiec "just does not seem to improve at all" despite various treatment attempts.  (*Id.*)  In October 2011, Dargus met Jalowiec again for his "severe headaches" which were presenting "every 2 or 3 days" and lasting up to "a couple of days."  (AR at 433.)  On November 15, 2011, Jalowiec met with his primary care physician, Charles Winjum, M.D. ("Dr. Winjum") due to worsening headache symptoms. (AR at 436.)  Dr. Winjum noted "[t]he frequency . . . and . . . intensity of these headaches are increasing," but described Jalowiec to be "in no acute distress."  (AR at 436-37.) Dr. Winjum referred Jalowiec to be seen by a neurologist the following day.  (AR at 437.)  On November 16, 2011, Jalowiec was seen by Shaun K. Christenson, M.D. ("Dr. Christenson") for a neurological consultation.  (AR at 473.)  Dr. Christensen's CT of the head and neck did not reveal abnormalities.  (AR at 530, 532-35, 1104-10.)

On December 20, 2011, Jalowiec went to the emergency room for a headache accompanied by symptoms of nausea and light sensitivity, exacerbated by movement. (AR at 367.)  At this emergency room visit, Jalowiec's heart rate and rhythm and neurological functions appeared normal.  (AR at 368.)  In early 2012, Jalowiec visited the emergency room on more occasions, presenting similar symptoms.  (AR at 519-20 (Jan. 22, 2012 visit); 517-18 (Jan. 30, 2012 visit); 515-16 (Feb. 12, 2012 visit).)  On February 27, 2012, Jalowiec visited Dr. Winjum for his headaches which "continued to

bother him" and caused him to miss "a lot of work."  (AR at 461; *see also* AR at 488 (describing Jalowiec's work absences as "missing 3/5 days of work per week").)  Due to these work difficulties, Jalowiec elected to take a twelve-week leave of absence from work.  (*See id.*)  February 24, 2012 would end up being Jalowiec's last day of work at Team Industries.  (*See* AR at 481.)  Jalowiec's headaches persisted.  (*See, e.g.*, AR at 463, 465, 467.)

On March 7, 2012, Jalowiec saw John Tulloch, M.D. ("Dr. Tulloch"), a neurologist, and received a Botox injection for the treatment of his migraine headaches. (*Id.* at 500-07.)  On March 13, 2012, Jalowiec went to the Sanford Neuroscience Clinic for a consultation with Cynthia Knutson, M.D. ("Dr. Knutson").  (AR at 487-91.)  At this visit, Jalowiec described his headaches as "continuous . . . since February 27, 2012." (AR at 488.)  Dr. Knutson noted Jalowiec's symptoms as "photophobia, phonophobia, nausea, difficulty thinking, dizziness, nausea rarely."  (*Id.*)  She did not complete a physical exam, noting that "[a] recent neurological exam with Dr. Tulloch . . . was normal."  (AR at 490.)

On May 24, 2012, Jalowiec had a neuropsychology consultation with Gregory Hauge, Ph.D. ("Dr. Hauge") to address his "chronic headache pain which ha[d] not responded to interventions."  (AR at 379.)  Dr. Hauge noted Jalowiec's cognitive difficulties, stating "[h]e feels that it takes increased effort to calculate, retrieve words and names and recall day-to-day events."  (*Id.*)  As with prior visits, Jalowiec's symptoms included dizziness and photophobia.  (AR at 380.)  Dr. Hauge noted, "[w]ife notes progressively worse headaches which are daily. . . [and] [h]e is unable to . . .

6

perform physical activities." (AR at 380.) Dr. Hauge observed Jalowiec "ambulating

independently" and described him to be "oriented to time and location and not acutely

confused." (*Id.*) Dr. Hauge administered thirteen tests to evaluate Jalowiec's cognitive

abilities. (AR at 380, 382.) Dr. Hauge's findings indicated Jalowiec's motor, reading,

writing, repetition, and auditory capabilities to be normal. (AR at 382.) His overall

memory performance was in the low average range. (*Id.*) His verbal processing abilities

were in the average to high average range. (*Id.*) His Working Memory Index and

Processing Speed Index fell at the 55th percentile. (*Id.*) On the Wisconsin Card Sorting

Test, Jalowiec's "[a]bstraction, problem solving, and the ability to benefit from error

corrected feedback . . . show[ed] mild and noticeable inefficiency." (*Id.*) Dr. Hauge

noted that "[t]here were 6 failures to maintain cognitive set which is well below low

average" and concluded Jalowiec's "[o]verall level [of] conceptual responding falls at the

19th percentile." (*Id.*) The Beck Depression Inventory to evaluate emotional status

indicated "significant self-reported symptoms," approximately half of which were

"somatic complaints with fatigue, energy loss, and sleep necessity being elevated." (AR

at 381.)

As a result of these tests, Dr. Hauge opined that Jalowiec's executive function

results were "outside the range of what [one] would anticipate given [Jalowiec's] age,

education and life experience." (*Id.*) Dr. Hauge indicated, "Overall, this patient is

demonstrating several areas of cognitive inefficiency." (*Id.*) He indicated that Jalowiec's

difficulties with executive function were "likely a direct reflection of a chronic headache

pain caused by interference of an ongoing process." (*Id.*) He also noted that depression

could be a contributing factor.  (*Id.*)  Dr. Hauge concluded by recommending the

following:  "At this point[,] [h]e is certainly not in a position to be involved in

competitive employment.  His cognitive and somatic difficulties would have a negative

impact on management and additional burden of medication therapies to assist with

management of chronic headache pain could produce further liability."  (AR at 383.)

In July 2012, Jalowiec spent a week at the Diamond Headache Clinic in Chicago,

Illinois, to treat his chronic symptoms.  (AR at 336-50.)  During this visit, Jalowiec had a

normal CT examination (AR at 346), a normal MR angiogram (AR at 348), a normal

MRI of the brain (AR at 349), and a normal MRV of the head (AR at 350).  Upon

discharge, Jalowiec was directed to take several medications each day and was directed to

engage in "[a]ctivity as tolerated."  (AR at 338.)  No specific restrictions were given at

this time.  (*Id.*)  On August 22, 2012, Dr. Winjum reported that following Jalowiec's visit

to the Diamond Headache Clinic, "[h]is headaches have been pretty much under control,"

but he continued to have symptoms of dizziness.  (AR at 1555.)  Dr. Winjum noted

Jalowiec's vital signs were stable, and he had a regular heart rate and rhythm.  (*Id.*)  On

October 1, 2012, Jalowiec again visited Dr. Winjum who noted Jalowiec's symptoms of

dizziness and nausea.  (AR at 1552.)  Specifically, Dr. Winjum noted that Jalowiec "gets

weak when he stands up and goes to his knees when he tries to walk."  (*Id.*)  Again,

Jalowiec had stable vital signs and a normal heart rate.  (*Id.*)

On October 22, 2012, Jalowiec met with Mark Linzer, M.D. ("Dr. Linzer") at

Hennepin County Medical Center.  (AR at 926-48.)  Jalowiec presented with the

following problems:  migraines, near syncope, palpitations, dizziness, nausea, anxiety,

and depression.  (AR at 927.)  Dr. Linzer noted that Jalowiec's migraines had resolved

after visiting the Diamond Headache Clinic, but "other [symptoms] persisted."  (AR at

929.)  In particular, he noted:  "When getting off couch, gets dizzy, fades to black,

catches himself on hands and knees.  Dizzy always present.  Has some [medicine] to help

with that.  Out of work 8 months.  Can't drive."  (*Id.*)  Jalowiec's responses to a patient

screening confirmed these symptoms, with Jalowiec noting that his dizziness kept him

from taking care of himself and that he had fallen more than once in the past year.  (AR

at 940.)  Jalowiec also reported having problems with memory.  (AR at 941.)  Dr. Linzer

reported normal cardiovascular symptoms and indicated his "[l]ab tests look good."  (AR

at 930, 943.)  He suspected Jalowiec was possibly suffering from postural orthostatic

tachycardia syndrome ("POTS"),[1] and he referred Jalowiec to Rehan Karim, M.D. ("Dr.

Karim"), a cardiac electrophysiologist, for a tilt-table test to assess this possible

condition.  (*Id.*; *see also* AR at 907.)

On November 23, 2012, Dr. Winjum completed a questionnaire sent by Aetna to

gather information about Jalowiec's medical condition.  (AR at 949-53.)  Dr. Winjum

indicated Jalowiec was primarily impaired due to "cognitive ability," and referred Aetna

to Dr. Hauge's May 24, 2012 evaluation to support Dr. Winjum's opinion that Jalowiec

---

[1]     According to medical literature submitted by Jalowiec to Aetna on appeal,
"[p]ostural tachycardia syndrome (POTS) is a clinical syndrome of orthostatic intolerance
characterized by the development of excessive tachycardia and symptoms of cerebral
hypoperfusion on standing."  (AR at 1282 (footnote omitted).)  Symptoms include
"chronic fatigue, exercise intolerance, dizziness, diminished concentration,
tremulousness, nausea, and recurrent syncope."  (*Id.*)

was "functionally impaired from [his own] occupation." (AR at 949.) He also referred
Aetna to Dr. Mark Linzer. (AR at 1546.) Regarding whether Jalowiec could perform
any reasonable occupation, Dr. Winjum noted: "[M]ay be able to work from home, but
[patient] does not drive [and] is unsteady. . . ." (*Id.*) In response to questions about
Jalowiec's cognitive functioning, Dr. Winjum noted that Jalowiec could follow a
three-step command and perform "Serial 7's or 3's." (AR at 952.) Dr. Winjum indicated
Jalowiec would not be "able to safely operate an automobile or other motorized vehicle."
(*Id.*) Dr. Winjum concluded with his opinion that Jalowiec was "[u]nable to work
currently." (AR at 953.)

On December 7, 2012, Jalowiec visited Dr. Karim and underwent a tilt-table test
as Dr. Linzer had suggested. (AR at 907-13.) The tilt-table test was determined to be
consistent with POTS. (AR at 907; *see also* AR at 925.) During the tilt-table test, when
Jalowiec was moved into a tilted position, his heart rate immediately rose, and Dr. Karim
noted "patient started having severe nausea with feeling severe lightheadedness and felt
pre-syncopal. He did not completely lose consciousness, however appeared fairly
uncomfortable feeling faint and dizzy." (AR at 925.) Jalowiec explained that the
experience he had during the tilt-table test "is exactly what happens clinically at the time
of his symptoms." (*Id.*)

On December 21, 2012, Jalowiec met with Dr. Linzer to review the results of
Dr. Karim's tilt-table test and to follow up on his continuing symptoms of dizziness and
syncope. (AR at 913-16.) Dr. Linzer noted that the tilt-table test was "quite positive for
POTS." (AR at 914.) Jalowiec continued to feel about the same, despite receiving a new

medication following the tilt-table test.  (*Id.*)  Dr. Linzer noted that Jalowiec "should not drive given his episodes of near syncope," and that he "may not be able to work until [symptoms] are lessened."  (*Id.*)  Jalowiec's cardiovascular condition showed "[n]o murmurs, clicks, gallops, or rubs," but Dr. Linzer noted his "[h]eart rate goes up with standing."  (AR at 915.)

On February 25, 2013, Dr. Karim completed an Attending Physician Statement from Aetna.  (AR at 962-963.)  Dr. Karim noted Jalowiec's primary diagnosis as POTS, citing the following objective findings:  "Postural increase in heart rate with upright posture as documented on tilt table testing."  (AR at 962.)  Subjective symptoms included "[l]ightheadedness" and "near syncope."  (*Id.*)  Dr. Karim was "unable to predict" Jalowiec's prognosis and noted he had referred him for a second opinion.  (AR at 963.)  In response to an inquiry about Jalowiec's activity restrictions, Dr. Karim noted that such restrictions would "[d]epend on patient['s] symptoms" and that this "may need 'formal' assessment."  (*Id.*)  Similarly, Dr. Karim reported Jalowiec's physical impairment to be in the "[s]light limitation of functional capacity/capable of medium manual work" category, but noted that this would also "[d]epend on patient's symptoms" and "[m]ay need a 'formal' assessment."  (*Id.*)  Dr. Karim reported no limitation of cardiac functional capacity.  (*Id.*)

On May 15, 2013, Jalowiec began seeing David Benditt, M.D. ("Dr. Benditt") at the CentraCare Heart and Vascular Center in St. Cloud, Minnesota.  (AR at 1368; 1371.)  Dr. Benditt is a specialist in cardiac electrophysiology who "pioneered the addition of

tilt-table testing to clinical practice." (AR at 1376).  On May 15, 2013, Dr. Benditt wrote

a letter to Aetna describing his opinion about Jalowiec's medical condition:

> Mr[.] Jalowiec is currently considered to have a severe form of autonomic
> dysfunction which has manifest initially as migraine headaches, but more
> recently as palpitations, postural instability, recurrent faints and excessively
> rapid heart beating. . . .  Currently, Mr[.] Jalowiec is unable to maintain an
> upright posture for more than a few minutes without loss of vision and
> subsequent falling.  The basis for his neurologic condition is currently
> unknown, but it falls within a group of autonomic dysfunction disorders.

(AR at 1368.)  Dr. Benditt described Jalowiec's symptoms as "profound weakness,

discomfort in the upper shoulder and neck, palpitations, gastrointestinal distress and

tremulousness."  (*Id.*)  He weighed in on Jalowiec's prognosis as follows:

> Given the nature of Mr[.] Jalowiec's symptoms, it is not possible for him to
> be productively employed at present and [he] should be considered totally
> disabled.  The duration of this disability is uncertain.  He will be
> undergoing further studies at the University of Minnesota Medical Center
> and will require [a] considerable period of rehabilitation assuming that is
> even possible. . . .  Under the circumstance, I fully support Mr[.] Jalowiec's
> request for full disability.

(*Id.*)  Dr. Benditt also completed an Attending Physician Statement to provide to Aetna.

(AR at 1371-74.)  He indicated Jalowiec's primary diagnosis to be "Autonomic

Dysfunction."  (AR at 1371.)  He indicated Jalowiec would have "[n]o ability to work,"

and imposed the following restrictions and limitations on Jalowiec's activity:  "No

physical activity requiring standing for more than 2-3 minutes."  (AR at 1372.)  He

opined that Jalowiec was capable of working one hour per day.  (*Id.*)  The objective

findings to support Dr. Benditt's conclusions included were noted as "[t]remor,

hypertension when standing, [and] weakness."  (*Id.*)

On July 10, 2013, Jalowiec underwent neurological testing completed by Dr. Tulloch.  (AR at 1210.)  On August 13, 2013, Dr. Tulloch sent Jalowiec a letter explaining the results of the intraepidermal nerve fiber density testing which were "abnormal."  (*Id.*)  Dr. Tulloch explained, "The study indicates a loss of small nerve fibers in the skin.  We will need an electrical study of large nerve fibers and some additional blood tests to complete your neurological evaluation."  (*Id.*)  Dr. Benditt referenced Dr. Tulloch's examination in an August 21, 2013 letter in support of Jalowiec's LTD claim, stating "[r]ecent biopsy at the University of Minnesota revealed marked reduction in skeletal muscle nerve endings."  (AR at 1209.)  Dr. Benditt explained:

> Mr[.] Jalowiec was initially thought to manifest primarily a postural orthostatic tachycardia syndrome-like picture, but subsequent evaluation by tilt-table testing and by neurologic evaluation at the University of Minnesota suggests that he does have a form of nervous system disease, which precludes his being able to work in a productive manner. . . .  Based on my evaluation of Mr[.] Jalowiec, it appears that his generalized weakness and mobility difficulties relate to a primary neurologic disease and that to the best of my knowledge this is not reversible in the foreseeable future.

(*Id.*)  Dr. Benditt described Jalowiec as having a "disability due to disturbance of autonomic function. . ." and concluded that Jalowiec "should be considered as totally disabled."  (*Id.*)

## IV.   Jalowiec's Claim for LTD Benefits

### A.   Award of STD Benefits

After stopping work in February 2012 due to his headaches and related symptoms, Jalowiec sought STD benefits from Aetna.  (AR at 480-85.)  As part of the application

process, in May 2012, Jalowiec completed an occupational therapy interview and
evaluation with Abby Husar ("Husar").  (AR at 403-04, 413-16.)  Husar documented
subjective findings from conversation with Jalowiec as well as objective findings
obtained during several physical tests.  (AR at 414-15.)

Subjectively, Jalowiec reported his normal headache pain was "5-6/10" going up
to "10+/10."  (AR at 414.)  He reported that he tries to assist with household duties such
as cooking and cleaning but "with increased activity he reports increase in symptoms."
(*Id.*)  Further, Jalowiec reported he was not able to drive.  (*Id.*)  Husar noted "[Patient]
states he use[d] to be very active, completing physical activity at least 3x/week and is not
able to do these activities at this time as migraines are limiting."  (*Id.*)  During this
interview, Jalowiec described his employment duties at Team Industries.  He reported his
job to be "[s]edentary" with six to eight hours of sitting per day.  (*Id.*)  He reported
having to carry his laptop during the day, but reported no "'heavy' lifting."  (*Id.*)

Objectively, Husar documented findings from several physical tests such as squats
and weight lifting.  (AR at 414-15.)  Husar noted that Jalowiec had "two slight loss[es] of
balance," reported dizziness throughout multiple tests, and wore sunglasses due to light
sensitivity.  (*Id.*)  When lifting weights from the floor to his waist, Jalowiec reported
"7/10 pain with lifting and increased dizziness."  (AR at 414.)  Jalowiec was unable to
complete the front carry test to evaluate his maximum capabilities in that exercise
because he needed a five-minute rest after initial testing.  (*Id.*)  He "required [an]
immediate break and [held his] head during [the] rest break."  (*Id.*)  Husar noted Jalowiec
reported he was "waiting for stars to go away" and "[did not] want to do that again."

(*Id.*)  In a kneeling and crouching exercise, Husar noted "[patient] does have increased symptoms with rapid change of position."  (*Id.*)  Husar's overall assessment was that Jalowiec had "minimal physical deficits with testing."  (*Id.*)  Husar completed a Capabilities and Limitations worksheet that indicated Jalowiec could lift 21-35 pounds frequently, and 36-75 pounds occasionally.  (AR at 413.)  Husar reported Jalowiec could be seated continuously and could stand frequently.  (*Id.*)  She reported he could kneel, lift, and carry occasionally.  (*Id.*)

On May 22, 2012, Aetna had neurologist Vaughn Cohan, M.D. ("Dr. Cohan") complete a physician review to evaluate Jalowiec's STD claim.  (AR at 397-400.)  After reviewing records from Dr. Winjum, Dr. Christenson, Dr. Knutson, Dr. Tulloch, and Husar, Dr. Cohan concluded "the documentation provided is not indicative of a functional impairment that would preclude the claimant from performing his own sedentary occupation during the period 2/27/12 through 6/1/12."  (AR at 398-99.)  In particular, Dr. Cohan noted that recent neurological exams were normal.  (AR at 398.)  Dr. Cohan also mentioned that Jalowiec had not completed formal neuropsychological testing, although Dr. Winjum stated he intended to order it.  (AR at 399.)  Dr. Cohan explained, "none of the medical documentation provided describes the claimant's headaches as sufficiently severe, intense, and/or frequent as to preclude work."  (*Id.*)  Following Dr. Cohan's evaluation, Aetna denied Jalowiec's claim for STD benefits.  (*See* AR at 249-50.)

On October 5, 2012, Aetna overturned its original decision to deny STD benefits and awarded Jalowiec STD benefits for the period of February 27, 2012 through

June 2, 2012.  (AR at 249-50, 293-295.)  Aetna file notes indicate that "[d]enial [was] not supported by the plan."  (AR at 249.)  Jalowiec's file was then referred for consideration of LTD benefits.  (AR at 293.)

### B.  Initial LTD Determination

To evaluate Jalowiec's claim for LTD benefits, on October 19, 2012, Aetna had Stephen Crate ("Crate") conduct a vocational review of Jalowiec's job.  (AR at 577-78.) Crate noted that the STD claim had listed Jalowiec's occupation as sedentary.  (AR at 578.)  However, he noted that Jalowiec's job description indicates he "must be able to frequently lift up to 25 [pounds] and occasionally up to 50 [pounds]" and that he "must be capable of riding ATV[']s, snowmobiles, motorcycles, tractors, etc[.]; writ[ing] reports and effectively present[ing] information to teams/supervisor." (*Id.*)  Crate also noted the job description indicated "occasional travel required." (*Id.*)  Based on this review, Crate indicated the job should be classified as medium duty. (*Id.*)  Crate performed a "[d]etailed DOT Look Up" to compare Jalowiec's job to occupations in the national economy. (*Id.*)  In doing so, Crate found two corresponding occupations which were both classified as light duty—Production Superintendent and Production Planner. (*Id.*)  He noted as an additional consideration that "[t]he requirement of riding ATV's, Four Wheelers and other recreational vehicles is not customarily part of this occupation but must be factored in . . . These tasks may NOT be essential to the job or combined occupation." (*Id.*)  Crate indicated the classification for the occupation of Motorcycle Racer would be heavy. (*Id.*)  He noted that if this were factored into his analysis, Jalowiec's job would be heavy and his occupation would be light. (*Id.*)  Crate concluded,

"[t]he job appears to be heavier than the occupation," but indicated he would re-visit these conclusions after clarifying Jalowiec's job description.  (*Id.*)

On October 19, 2012—the same day Crate completed his vocational review—Jalowiec completed a LTD Claimant Interview with an Aetna representative.  (AR at 578-81.)  The interviewer described Jalowiec's current condition "chronic daily headaches with vertigo . . . balance issues, [and] cognitive decline."  (AR at 580.)  The interviewer noted Jalowiec's visit to the Diamond Headache Clinic and stated "since then has had one severe migraine, now just having the daily headaches and associated severe symptoms."  (*Id.*)  The interviewer described these symptoms in detail:

> [Jalowiec h]as ongoing daily issues with severe vertigo which causes balance issues. . . . [H]e is mostly bedridden as when he gets up he feels faint or he crashes into the walls of his home when trying to walk.  States when he gets up to use the bathroom he feels it is hazardous even walking to the other room.  Wife has to help with . . . housework, errands . . . as [he] is unable to perform these activities. . . .
>
> Cognitively, he still feels very impaired, with difficulty finding the words he wants to say, memory issues, cognitive fog, difficulty with simple calculations. . . .
>
> He feels he cannot even perform daily living activities therefore would be unable to sustain work activity.

(AR at 580-81.)  The interviewer explained that although Jalowiec had seen numerous doctors they "[could not] find the cause of his ongoing issues."  (AR at 580.)  The interviewer also interviewed Jalowiec about his job duties.  Jalowiec described his position of DDC Supervisor as involving supervising the drafting department and managing two large databases.  (AR at 581.)  The interviewer noted the job was "[m]ostly a sedentary occ[upation] with some lifting."  (*Id.*)  Jalowiec explained that

riding ATVs, snowmobiles, etc., was not a material duty of his own job even though he might occasionally be asked to test the product or take a ride once per year.  (*Id.*)  He clarified this was "nothing he regularly does."  (*Id.*)

On November 16, 2012, an Aetna nurse, Michael Grace, R.N. ("Grace"), completed a clinical review to evaluate Jalowiec's LTD claim.  (AR at 610-13.)  Grace evaluated Jalowiec's condition based primarily on a diagnosis of migraine headaches and indicated, "[t]here continues to be a lack of clinical evidence that would support [Jalowiec] being precluded from work for migraine headache."  (AR at 612.)  He based this conclusion largely on Dr. Winjum's statement that Jalowiec's headaches were "pretty much under control" after his visit to the Diamond Headache Clinic in Chicago.  (*Id.*)  Grace noted the new possible diagnosis of POTS, but dismissed this because Jalowiec's "blood pressure and pulse rates are completely normal."  (*Id.*)

On November 29, 2012, Aetna denied Jalowiec's claim for LTD benefits.  (AR at 156-59.)  Aetna reviewed Jalowiec's file, including medical records from Dr. Winjum, the Diamond Headache Clinic, Dr. Linzer, and Dr. Hauge and peer reviews conducted by Dr. Cohan, nurse Michael Grace, and Aetna's behavioral health clinician.  (AR at 157-58.)  Aetna focused primarily on Jalowiec's headaches as the source of Jalowiec's claim for LTD benefits, stating "[t]here is no clinical evidence within the records [from Diamond Headache Clinic] that would preclude a functional impairment from work activity due to migraine headache."  (AR at 157.)  Aetna acknowledged that Jalowiec had experienced "some dizziness and nausea" as well as "syncope, palpitations, . . . anxiety and depression," but emphasized Dr. Winjum's statement that Jalowiec's "headaches

[were] pretty much under control." (*Id.*)  Aetna relied heavily on Dr. Cohan's findings

based on peer consultation with Dr. Winjum.  (*Id.*)  In particular, Aetna noted

"Dr. Winjum indicates that he completed the Attending Physician Statement indicating

that [Jalowiec] could not work until 6/1/12 based upon . . . self-reported subjective

complaints without associated objective findings." (*Id.*)  Aetna also disregarded

Jalowiec's POTS diagnosis based on Grace's evaluation that "blood pressure and pulse

readings are normal." (*Id.*)  Aetna reiterated Grace's findings, claiming "[t]here

continues to be a lack of clinical evidence that would support [Jalowiec] from being

precluded from work due to headaches or any other condition." (*Id.*)  Based on a

behavioral health clinician's review of Dr. Hauge's neuropsychological exam findings,

Aetna concluded that Jalowiec's "cognitive difficulty [was] a direct reflection of chronic

headache pain," with "depression [as a possible] contributing factor." (*Id.*)  The

behavioral health clinician reached out to Dr. Winjum for consultation and determined

that "Jalowiec's primary impairment is cognitive" and "if [his] physical conditions of

headaches were to resolve, [Jalowiec's] mental health would not preclude [him] from

working." (AR at 158.)  Aetna concluded, "[t]he information contained in the file does

not support your inability to perform your own occupation of DDC Supervisor." (*Id.*)

Aetna provided Jalowiec with an opportunity to appeal this determination, and stated,

"we will review any additional information you care to submit." (*Id.*)  Aetna then listed

examples of the medical information Jalowiec could submit to support his appeal of

Aetna's decision.  (*Id.*)

Following its denial of Jalowiec's LTD claim, Aetna received new information about Jalowiec's medical condition from visits with Dr. Karim and Dr. Linzer.  (AR at 640-44 ("[Jalowiec] has submitted additional medical records for review, which have confirmed diagnosis of dysautonomia, including tilt table testing which confirms diagnosis and shows immediate response of rising heart rate, severe nausea, severe lightheadedness and pre-syncopal symptoms upon tilt.").)  New Aetna notes listed Jalowiec's primary diagnosis as "Unspecified Disorder of Autonomic Nervous System." (AR at 641.)

On January 16, 2013, nurse Grace reviewed the new information submitted by Jalowiec to evaluate whether the new records supported Jalowiec's LTD claim.  (AR at 644-47.)  Grace acknowledged that the POTS diagnosis had been confirmed due to testing and that recent records suggested Jalowiec "may not be able to work until his symptoms have been lessened."  (AR at 646.)  However, Grace emphasized that "there are no specific restrictions or limitations . . . specific to the POTS diagnosis."  (*Id.*) Grace suggested that Aetna send an Attending Physician Statement form to Dr. Karim for more detail.  (*Id.*)

On March 1, 2013, Grace reviewed the updated Attending Physician Statement from Dr. Karim and commented on its relevance to Jalowiec's LTD claim.  (AR at 654-56.)  Grace noted that "Dr. Karim clearly indicate[d] [Jalowiec] has medium level capacity, and is under no physician-based restrictions or limitations."  (AR at 655.)  He also mentioned, "If [Jalowiec] is referred for a [second] opinion, as indicated by

Dr. Karim, will await visit notes and possible restrictions/limitation from the consulting physician." (*Id.*)

On March 7, 2013, Aetna upheld its initial denial, relying on Dr. Karim's Attending Physician Statement to conclude that Jalowiec was capable of "medium level physical work" with no "specific restrictions and limitations that would preclude [Jalowiec] from [his] own occupation." (AR at 150-51.) Aetna's letter explained that Jalowiec's occupation of DDC Supervisor was classified as "light physical demand." (AR at 151.) Aetna concluded, "[t]he information contained in the file does not support [Jalowiec's] inability to perform [his] own occupation of DDC Supervisor and the recent information is not sufficient to warrant a reversal of your disability claim decision at this level." (*Id.*) Aetna again provided examples of information Jalowiec could submit for further review and indicated that a subsequent request for reconsideration would need to be a formal written appeal. (*Id.*)

### C.    Appeal of LTD Denial

On June 18, 2013, Jalowiec filed a formal written appeal of Aetna's LTD claim denial, with supporting documentation. (AR at 1264-1378.) Most notably, the new supporting documentation included more detail about Jalowiec's job description from Team Industries, a statement by his wife about his day-to-day symptoms and quality of life, and information from Dr. Benditt about Jalowiec's evolving diagnosis. (*Id.*)

On August 14, 2013, while Jalowiec's appeal was under consideration by Aetna, Jalowiec received a favorable decision from the Social Security Administration ("SSA") granting him disability benefits. (AR at 1211-30.) On August 20, 2013, Jalowiec's

attorney provided this decision to Aetna for review, explaining that "[t]he SSA determined Mr. Jalowiec is disabled and unable to perform any gainful occupation based on the exact same medical information, job descriptions, personal statements, and other evidence that has been provided to Aetna."  (AR at 1211.)  Jalowiec's attorney specifically noted SSA findings that Aetna should consider in its review of Jalowiec's claim, including the SSA's determination that Jalowiec's subjective symptoms are credible, that he has a good work ethic and would continue working if he were able, and that the medical opinions of Dr. Hauge and Dr. Benditt should be afforded great weight. (*See* AR at 1212-13, 1222-24.)

On August 27, 2013, Jalowiec's attorney sent Aetna additional information regarding Dr. Tulloch's abnormal biopsy results and Dr. Benditt's opinion that what was initially suspected to be POTS was in fact a neurologic disease that precluded Jalowiec from being able to work.  (AR at 1207-1210.)  Jalowiec's attorney explained: "[Jalowiec's] treating Cardiac Electrophysiologist, Dr. Benditt, and his treating Neurologist, Dr. Tulloch, are still in the process of ordering additional testing to determine Mr. Jalowiec's exact nervous system disorder and the best way to treat his condition."  (AR at 1207.)  The attorney explained that Jalowiec would provide additional testing results and medical records to Aetna as they became available.  (*Id.*)

On September 11, 2013, Aetna had Leann Wolfinger ("Wolfinger") conduct a vocational review of Jalowiec's job description.  (AR at 672.)  Wolfinger concluded that Jalowiec's occupation most closely correlated to the "Supervisor, Drafting and Printed

Circuit Design" position based on a DOT look-up.  (*Id.*)  Wolfinger noted that this

occupation is considered to be sedentary.  (*Id.*)

On September 16, 2013, Aetna reviewer Leonard Schnur, Psy.D. ("Dr. Schnur")

conducted a review of Jalowiec's file from a psychological perspective.  (AR at 902-05.)

Dr. Schnur's review listed Jalowiec's occupation as sedentary.  (AR at 902.)  Initially,

Dr. Schnur stated that a review of Jalowiec's physical complaints (related to Jalowiec's

diagnosis of "unspecified disorder of autonomic nervous system") were beyond the scope

of his own expertise.  (AR at 903.)  Thus, he limited his review to cognitive, emotional,

and behavioral limitations.  (AR at 903-04.)  Dr. Schnur noted that examination notes

from Dr. Winjum, Dr. Benditt, Dr. Feoktistov (at the Diamond Headache Clinic), and

Dr. Karim referenced complaints of cognitive impairment, anxiety, and depression, but

stated "the examination notes did not contain any formal measurements of cognitive and

emotional functioning to substantiate impairment from a psychological standpoint."  (AR

at 903.)  In addition, Dr. Schnur discussed Dr. Hauge's May 24, 2012 neuropsychological

evaluation and noted Dr. Hauge's conclusion that Jalowiec was not capable of

competitive employment.  (*Id.*)  However, Dr. Schnur concluded that "the testing did not

fully substantiate the presence of a functional impairment which may preclude the

claimant from performing work of his own occupation."  (AR at 903-04.)  He opined that

"[a] mild liability in working memory and processing speed as well as cognitive

inefficiency would not necessarily preclude the claimant from performing the work of his

own occupation."  (AR at 904.)  Dr. Schnur did not reach out to any of Jalowiec's

treating providers for peer-to-peer consultation.  (AR at 904.)

On September 25, 2013, Aetna reviewer Dr. Joshua Alpers, M.D. ("Dr. Alpers"), a neurologist with expertise in electrodiagnostic medicine, conducted a review of Jalowiec's file from a neurological perspective.  (AR at 882-86.)  Dr. Alpers's review listed Jalowiec's occupation as sedentary.  (AR at 882.)  Dr. Alpers reviewed Jalowiec's file, but noted that "[m]any of the medical records provided for review are partially uninterruptable [sic - unintelligible] due to poor quality of the document image."  (AR at 883.)  Dr. Alpers also reached out for peer-to-peer consultation with Dr. Winjum and Dr. Tulloch.  (AR at 883-84.)  Dr. Alpers reported that Dr. Winjum stated "[Jalowiec's] headaches do not appear to be a significant source of functional impairment."  (AR at 884.)  Dr. Winjum further explained, "[Jalowiec] is now wheelchair-bound due to postural symptoms. . . ."  (*Id.*)  Dr. Alpers did not reach Dr. Tulloch on either of the two attempts he made on September 23 and 24, 2013.  (*Id.*)

Based on his review of the information, Dr. Alpers concluded, "[f]rom a neurological standpoint, functional impairment is not supported. . . ."  (*Id.*)  Dr. Alpers noted that Jalowiec's headaches had improved after treatment at the Diamond Headache Clinic, and suggested that "the provided medical records do not clearly establish that the headaches in themselves were of adequate severity as to require restrictions or limitations."  (AR at 885.)  He further opined, "[t]he reported cognitive impairment was felt to owe to his headaches; as such, this impairment would therefore have resolved with resolution of his headaches."  (*Id.*)  Dr. Alpers also noted Jalowiec's primary impairments of "postural dizziness and visual symptoms . . . attributable to POTS per results of a tilt-table test."  (*Id.*)  However, Dr. Alpers stated that he could not complete an evaluation

of this condition because POTS is a "cardiac (non-neurological) condition" beyond the

scope of a neurology review.  (*Id.*)  Dr. Alpers did comment on Dr. Benditt's opinion that

Jalowiec's symptoms were related to a more generalized autonomic dysfunction and

Dr. Tulloch's biopsy results, stating:

> Though Dr. Benditt felt that this owed to more widespread autonomic
> dysfunction, the claimant's additional symptoms (self-reported weakness,
> pain, GI symptoms, and tremulousness) are largely self-reported in nature
> with very little evidence of associated clinical abnormalities.  The reported
> reduction in intraepidermal nerve fiber density at the right foot is of
> questionable clinical relevance; though this could signal a more widespread
> small-fiber neuropathy, a proximal site was not biopsied to validate the
> finding; furthermore, though postural abnormalities are noted, the provided
> medical records do not indicate associated symptoms suggestive of
> small-fiber nerve dysfunction (e.g. sensory loss, allodynia, sudomotor
> dysfunction).

(*Id.*)  Dr. Alpers concluded, "[i]n the absence of establishment of clinical relevance of the

biopsy finding as well as the absence of any other form of clinical evidence of

neurological dysfunction, a neurological basis for the claimant's postural symptoms is not

currently supported."  (*Id.*)  Dr. Alpers stated that the restrictions and limitations imposed

by Jalowiec's doctors were "not supported by the medical evidence."  (*Id.*)  However,

Dr. Alpers also noted that the restrictions and limitations imposed were primarily for

non-neurological indications, and he disclaimed an ability to comment on functional

impairments associated with any non-neurological conditions as "beyond the scope of a

[n]eurology review."  (*Id.*)

On September 25, 2013, Aetna reviewer Mark Eaton, M.D. ("Dr. Eaton")

conducted a review of Jalowiec's file from a cardiovascular perspective.  (AR at 889-92.)

Dr. Eaton's review listed Jalowiec's occupation as sedentary.  (AR at 889.)  Dr. Eaton

reviewed Jalowiec's file and also reached out for peer-to-peer consultation with

Dr. Karim.  (AR at 889-90.)  Dr. Eaton did not reach Dr. Karim on either of the two

attempts he made on September 24 or 25, 2013.  (AR at 890.)  Based on his review of

Jalowiec's file, Dr. Eaton concluded a "functional impairment is not supported . . . ."

(AR at 891.)  Dr. Eaton opined, "[g]iven the claimant's reported clinical symptoms and

the statements from his treating providers I would recommend restricting the claimant to

a sedentary work duty level occupation." (*Id.*)  Specifically, he recommended that

Jalowiec could exert up to ten pounds of force occasionally and/or up to a negligible

amount of force frequently.  (*Id.*)  Dr. Eaton disagreed that Jalowiec should be considered

unable to work because "[r]eview of the submitted medical records [did] not support the

restrictions [and] limitations (from a cardiovascular standpoint) imposed by the treating

provider(s)." (*Id.*)  He explained, "it is unclear from my review of the medical records

whether the claimant actually has a cardiovascular disorder or disease." (*Id.*)

Specifically, he noted that there were no "clinical findings consistent with unstable

angina pectoris, decompensated congestive heart failure, syncope/near-syncope or

clinically significant cardiac arrhythmia." (*Id.*)  Dr. Eaton also noted that Dr. Benditt

reported Jalowiec's symptoms to be "related to 'a primary neurologic disease. . . .'" (*Id.*)

He concluded by reiterating his opinion that "[Jalowiec] would be capable of performing

his own sedentary level occupation." (*Id.*)

On September 26 and 30, 2013, Aetna sent Dr. Alpers's report to Dr. Tulloch and

sent Dr. Eaton's report to Dr. Karim, requesting that they review the reports and respond

to any areas of disagreement.  (AR at 776, 777, 780.)  Neither treating provider

responded before Aetna rendered its decision on Jalowiec's appeal.  (AR at 780.)  None

of the Aetna reviewers sought peer-to-peer consultation with Dr. Hauge, Dr. Linzer, or

Dr. Benditt.  (AR at 884, 890, 904.)

On October 10, 2013, Aetna notified Jalowiec's attorney that it was upholding its

denial of LTD benefits because "there was a lack of medical evidence from [Jalowiec's]

treating providers supporting a functional impairment that would have prevented him

from performing the material duties of his own occupation as of [his LTD effective date

of] May 27, 2012."  (AR at 778-80.)  Aetna explained Jalowiec's medical history,

including his headaches, cognitive impairments, and the POTS diagnosis later deemed to

be a severe form of autonomic dysfunction.  (AR at 779.)  Aetna described Jalowiec's

headache condition as "resolved following treatment at a headache clinic in Chicago with

persistence of other symptoms [including] postural dizziness and visual symptoms."  (*Id.*)

Aetna also referenced MRI, MRA, MRV, and echocardiography results from July 2012

which were all normal.  (*Id.*)

Aetna also described Dr. Hauge's neuropsychological evaluation and his

conclusion that Jalowiec was unable to work, but relied on the opinion of Dr. Schnur to

conclude that "the testing did not fully substantiate the presence of a functional

impairment, which would preclude Mr. Jalowiec from performing the material duties of

his own occupation."  (*Id.*)  Aetna used near-identical language to Dr. Schnur's report,

stating, "[a] mild liability in working memory and processing speed as well as cognitive

inefficiency would not necessarily preclude your client from performing his own

occupation."  (*Id.*)

In addition, Aetna referenced Dr. Karim's tilt-table testing and his associated interpretation that the test was "positive for POTS." (*Id.*) Aetna drew from Dr. Eaton's analysis of these records, however, to conclude that "the review of the medical records do not indicate clinical findings consistent with unstable angina pectoris, decompensated congestive heart failure, syncope/near syncope or clinically significant cardiac arrhythmia supporting a functional impairment that would prevent Mr. Jalowiec from performing the material duties of his own occupation." (*Id.*)

Aetna further described Jalowiec's condition by referencing Dr. Benditt's May 2013 and August 2013 letters. (*Id.*) Aetna acknowledged Dr. Benditt's observation that Jalowiec "was unable to stand for more than a few minutes without loss of vision and subsequent falling. . ." and his conclusion that Jalowiec should be considered unable to work. (*Id.*) Aetna noted Dr. Tulloch's biopsy finding of abnormal intraepidermal nerve fiber density and Dr. Benditt's associated conclusion that "Jalowiec was disabled due to disturbance of autonomic dysfunction." (*Id.*) Specifically, Aetna noted that what was initially suspected to be POTS was later determined by Dr. Benditt to be "a form of nervous system disease, which precludes his being able to work in a productive manner." (*Id.*) Aetna adopted Dr. Alpers's position with respect to Dr. Benditt's conclusions, stating:

> Although Dr. Benditt opined that your client's widespread autonomic dysfunction would prevent him from working, your client's self-reported symptoms such as weakness, pain, GI symptoms and tremulousness, are considered self-reported in nature, they provide very little evidence associated with clinical abnormalities. The reported reduction in intraepidermal nerve fiber density at the right of the foot is of questionable clinical relevance, though this may signal a more widespread small-fiber

> neuropathy.  Also, although postural abnormalities are noted, the provided
> medical records do not indicate associated symptoms of small-fiber
> dysfunction such as sensory loss, allodynia or sudomotor dysfunction.

(AR at 779-80.)

Aetna stated that its decision to deny Jalowiec's claim for LTD benefits was final and not subject to further review, and Aetna advised Jalowiec's attorney that he could bring a civil action to challenge the decision within one year following Aetna's final decision of the claim.  (AR at 780.)

On January 2, 2014, Jalowiec's attorney requested that Aetna reverse its denial of LTD benefits.  (AR at 858-61.)  Jalowiec sought clarification regarding why Jalowiec's occupation had been classified as "sedentary" throughout the appeal process when it had originally been deemed medium or at least light duty.  (AR at 858.)  Further, Jalowiec pointed out the SSA determination which Jalowiec argued should be given weight in Aetna's analysis of his LTD claim.  (AR at 859.)  Finally, Jalowiec suggested that Aetna's three physician reviews were not sufficiently thorough.  (*Id.*)

On January 10, 2014, Aetna responded to Jalowiec's request for reconsideration, and stated it was upholding its decision.  (AR at 782-83.)  Aetna explained that Jalowiec's job classification was changed to sedentary based on the referral for a new vocational assessment during the appeal process.  (AR at 783.)  Aetna also indicated that it was aware of the SSA determination but noted that Aetna's disability determinations and the SSA's determinations "are not always the same."  (*Id.*)  Aetna suggested that the difference "may be driven by the [SSA] regulations."  (*Id.*)  Aetna also suggested that Jalowiec's file was thoroughly reviewed by its three independent reviewers.  (*Id.*)  Aetna

referred Jalowiec to its October 10, 2013 denial and advised Jalowiec, "[y]ou have now exhausted the appeal procedures under the group policy/plan; therefore, our decision is not subject to further administrative review." (*Id.*)

On February 7, 2014, an Aetna representative spoke with one of Jalowiec's attorneys and explained its decision to reevaluate Jalowiec's job classification on appeal. (AR at 314.)  According to the Aetna representative, the October 2012 vocational review which referenced the occupation of motorcycle racer was revisited "with all available info[rmation]" in September 2013.  (*Id.*)  Upon review, the occupation "as it is performed in the national economy [was] in fact sed[entary]."  (*Id.*)  The Aetna representative explained that although Jalowiec's job itself may not have been sedentary, Aetna "insure[s the] occ[upation]."  (*Id.*)

On February 25, 2014, Jalowiec's attorney sent Aetna a letter requesting that Aetna "reconsider and reverse its 'final' denial of Mr. Jalowiec's claim for LTD benefits."  (AR at 825-28.)  The attorney suggested that "Aetna's classification of Mr. Jalowiec's own occupation as 'Sedentary' is an inaccurate representation of the nature of Mr. Jalowiec's job duties, [and is in]consistent with Aetna's own representation of its characterization of such position as identified in its letter dated March 7, 2013 denying his claim for LTD benefits."  (AR at 826.)  Jalowiec's attorney also reiterated its position that the SSA decision should be given weight in Aetna's determination because the Administrative Law Judge determined that Jalowiec "was unable to perform his own occupation, both 'as performed' as well as generally 'performed in the national economy'."  (AR at 827.)  Jalowiec's attorney also reminded Aetna of its fiduciary

obligation "to provide [Jalowiec] with a detailed explanation of its basis for denying his claim." (*Id.*)

On March 19, 2014, Aetna responded to Jalowiec's letter, stating that it would not be affording him another review of his LTD claim. Aetna referred Jalowiec to its January 10, 2014 letter, and stated "[i]t is Aetna's position that all administrative remedies have been exhausted and the administrative record is closed." (AR at 823.) Aetna notified Jalowiec of his right to bring a civil action under ERISA and reiterated, "[y]ou have now exhausted the appeal procedures under the group policy. Therefore, our decision is not subject to further administrative review." (*Id.*)

On October 16, 2014, Jalowiec commenced this lawsuit against Aetna. (Doc. No. 1 ("Compl.").) In the Complaint, Jalowiec asserts the following claims against Aetna: (I) wrongful denial of disability benefits (violation of 29 U.S.C. § 1132(a)(1)(B), ERISA § 502(a)(1)(B)); and (II) recovery of attorney's fees and costs (29 U.S.C. § 1132(g)). (*Id.* ¶¶ 110-16.) Both parties now move for summary judgment on both claims. (*See* Doc. Nos. 23 & 27.)

## DISCUSSION

## I.     Standard of Review

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *Weitz Co. v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009). However, "[s]ummary judgment procedure is properly

regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

The Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq.*, governs the insurance policy in question. Employee benefit plans under ERISA must "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2). Following such a review, a beneficiary of a plan governed by ERISA may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary

authority to determine eligibility for benefits or to construe the terms of the plan."

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  When a plan gives

discretionary authority to the administrator or fiduciary to determine eligibility for

benefits or to construe the terms of the plan, the Court reviews the decision to deny

benefits for an abuse of discretion.  *See id.; see also Metro. Life Ins. Co. v. Glenn*, 554

U.S. 105, 111 (2008); *Waldoch v. Medtronic, Inc.*, 757 F.3d 822, 829 (8th Cir. 2014), *as

corrected* (July 15, 2014).

### A.      Discretion-Granting Language

Aetna is a fiduciary with respect to Jalowiec's LTD plan.[2]  (*See* PD at 56.)

However, the parties dispute whether the plan gives Aetna discretionary authority to

trigger deferential abuse-of-discretion review.  Jalowiec acknowledges that "the contract

between Aetna and Team Industries contains discretion-granting language."  (Doc.

No. 29 at 18 (citing PD at 56).)  However, Jalowiec contends that "[t]he LTD Plan itself

does not contain such language," (*id.* at 18), and asserts that "[t]he discretionary language

must be in the Plan itself, not a related plan document."[3]  (*Id.* at 18-19 (citing *Jobe v.*

---

[2]      Under ERISA:
[A] person is a fiduciary with respect to a plan to the extent (i) he exercises
any discretionary authority or discretionary control respecting management
of such plan or exercises any authority or control respecting management or
disposition of its assets, . . . or (iii) he has any discretionary authority or
discretionary responsibility in the administration of such plan.
29 U.S.C. § 1002(21)(A).

[3]      Jalowiec also claims that Aetna's failure to furnish Jalowiec a copy of the contract
between Aetna and TEAM Industries is "worth noting" in determining whether the plan
(Footnote Continued on Next Page)

*Med. Life Ins. Co.*, 598 F.3d 478 (8th Cir. 2010); *Ringwald v. Prudential Ins. Co. of Am.*, 609 F.3d 946 (8th Cir. 2010)).) In response, Aetna argues that the discretion-granting language cited by Jalowiec properly establishes a basis for the Court's exercise of deferential review, despite its location in the insurance policy (described by Aetna as the "Wrap Policy"). (Doc. No. 34 at 8-9.) Further, Aetna relies on general principles of incorporation by reference to suggest that the "Wrap Policy," the "Booklet-Certificate," and the "Summary of Coverage" are together "one document [which] comprise[s] the Plan." (*Id.* at 9.) Aetna argues that the operative terms of the plan, as established in these documents, contain "a clear grant of authority to Aetna." (*Id.*)

To determine whether "the benefit plan gives the administrator or fiduciary discretionary authority," *Firestone*, 489 U.S. at 115, courts must look for "'explicit

_____

(Footnote Continued From Previous Page)

gives Aetna discretionary authority. (Doc. No. 20 at 18 n.15.) Jalowiec further argues that "if the contract containing discretion-granting authority is indeed part of the LTD Plan, as Aetna now contends, then Aetna admits that it violated ERISA by not providing Jalowiec with a copy of these purported plan documents when he requested a complete copy of the plan." (Doc. No. 35 at 14.) The Court finds this argument unpersuasive and irrelevant. As Aetna rightly notes, Team Industries—not Aetna—is the Plan Administrator per the terms of the Summary Plan Description, (*see* PD at 25), and ERISA regulations require the Plan Administrator to furnish requested documents to participants and beneficiaries (Doc. No. 34 at 10 n.1 (citing 29 U.S.C. § 1024(b))). (*See also* PD at 27 (describing participants' right to obtain "copies of documents governing the operation of the Plan" by making a written request to the "Plan Administrator").) Further, whether Aetna was required to furnish the particular document in question does not bear on the Court's analysis of whether there was "'explicit discretion-granting language' in the policy or in other plan documents to trigger the ERISA deferential standard of review." *See McKeehan v. Cigna Life Ins. Co.*, 344 F.3d 789, 793 (8th Cir. 2003) (citation omitted).

discretion-granting language' in the policy or in other plan documents. . . ." *McKeehan v. Cigna Life Ins. Co.*, 344 F.3d 789, 793 (8th Cir. 2003) (quoting *Walke v. Grp. Long Term Disability Ins.*, 256 F.3d 835, 839 (8th Cir. 2001)).  Determining what constitutes the governing plan in ERISA cases "is not always a clear-cut task." *Admin. Comm. of Wal-Mart Stores, Inc. v. Gamboa*, 479 F.3d 538, 542 (8th Cir. 2007).  In particular, "[o]ften the terms of an ERISA plan must be inferred from a series of documents none clearly labeled as 'the plan.'" *Id.* (quoting *Health Cost Controls of Ill. v. Washington*, 187 F.3d 703, 712 (7th Cir. 1999)).  If two plan documents are in conflict, discretion-granting language in one document may be rendered ineffective by the lack of such language in another.  *See Johnson v. United of Omaha Life Ins. Co.*, 775 F.3d 983, 987-88 (8th Cir. 2014) (discussing *Jobe*, 598 F.3d 478; *Ringwald*, 609 F.3d  946).  However, if the two documents are integrated, there is no conflict, and the discretion-granting language in one plan document may control.  *Id.* at 988.

"[I]n interpreting the terms of the plan, like all contracts, '[c]ourts must look at the ERISA plan as a whole.'" *Shaw v. Prudential Ins. Co. of Am.*, 566 F. App'x 536, 539 (8th Cir. 2014) (quoting *Johnson v. Am. United Life Ins. Co.*, 716 F.3d 813, 820 (4th Cir. 2013)) (finding discretion-granting language sufficient to trigger deferential abuse-of-discretion review in a global "wrap-plan document").  Recently, the Eighth Circuit emphasized that "courts should give the language of the policy and [the summary plan description] a common and ordinary meaning and construe the documents as a reasonable person in the position of the [plan] participant, not the actual participant,

would have understood the words." *Johnson*, 775 F.3d at 987-88 (internal quotation marks and citation omitted).

Applying these principles to the plan language here, the Court concludes that the plan contains explicit discretion-granting language warranting the Court's exercise of a deferential abuse-of-discretion review. First, the Court concludes that a reasonable person would read and understand all of the related plan documents to constitute the terms of one integrated plan. A section in the Certificate of Coverage Booklet titled "General Information About Your Coverage," states "[t]his document describes the main features of this Plan. *Additional provisions are described elsewhere in the group contract*." (PD at 16 (emphasis added).) The Summary of Coverage also references the group contract and the Booklet-Certificate, indicating that all of the documents are to be read and construed as a whole. (PD at 24.) Second, the Court concludes that the group contract (described by Aetna as the "Wrap Policy") contains explicit discretion-granting language. The terms of the group contract between Aetna and Team Industries are included in the Group Life and Accidental and Health Insurance Policy. (*See* PD at 29.) The contract states:

> For the purpose of section 503 of Title 1 of [ERISA], Aetna is a fiduciary with complete authority to review all denied claims for benefits under this policy. *In exercising such fiduciary responsibility, Aetna shall have discretionary authority to: determine whether and to what extent employees and beneficiaries are entitled to benefits; and construe any disputed or doubtful terms of this policy.* Aetna shall be deemed to have properly exercised such authority unless Aetna abuses its discretion by acting arbitrarily and capriciously.

(PD at 56 (emphasis added).)  This language explicitly grants discretionary authority to Aetna, the plan fiduciary, to determine benefit eligibility and to construe the terms of the policy.  Thus, the Court will review Aetna's decision to deny Jalowiec's claim for long-term disability benefits under an abuse-of-discretion standard.

### B.      Abuse-of-Discretion Standard

Under the abuse-of-discretion standard, "the administrator's decision should be reversed 'only if it is arbitrary and capricious.'"  *Green v. Union  Sec. Ins. Co.*, 646 F.3d 1042, 1050 (8th Cir. 2011) (quoting *Midgett v. Wash. Grp. Int'l Long Term Disability Plan*, 561 F.3d 887, 896 (8th Cir. 2009)).  "A court is not to substitute its own judgment for that of the plan administrator."  *Alexander v. Trane Co.*, 453 F.3d 1027, 1031 (8th Cir. 2006).  The issue is whether the decision was supported by substantial evidence which means "more than a scintilla but less than a preponderance."  *Waldoch*, 757 F.3d at 832 (quoting *Midgett,* 561 F.3d at 897) (internal quotation marks omitted).  The Court "may consider both the quantity and quality of evidence before a plan administrator."  *Wise v. Kind & Knox Gelatin, Inc.*, 429 F.3d 1188, 1190 (8th Cir. 2005) (citation omitted).  The question for the Court is whether a "reasonable person *could* have reached a similar decision, given the evidence before him, not [whether] a reasonable person *would* have reached that decision."  *Prezioso v. Prudential Ins. Co. of Am.*, 748 F.3d 797, 805 (8th Cir. 2014) (quoting *Ferrari v. Teachers Ins. & Annuity Ass'n*, 278 F.3d 801, 807 (8th Cir. 2002) (emphasis in original)).  A court examining whether an administrator abused its discretion, therefore, must carefully scrutinize the administrator's decision and determine whether it was "extremely unreasonable, extraordinarily imprudent, or

arbitrary and capricious." *Meyers v. Hartford Life & Accident Ins. Co.*, 489 F.3d 348,

351 (8th Cir. 2007) (citation omitted).  "When . . . a conflict of interest exists because the

Plan is both the decision-maker and the insurer, [the Court] take[s] that conflict into

account and give[s] it some weight in the abuse-of-discretion calculation." *Carrow v.*

*Standard Ins. Co.*, 664 F.3d 1254, 1258-59 (8th Cir. 2012) (citing *Manning v. Am.*

*Republic Ins. Co.*, 604 F.3d 1030, 1038-39 (8th Cir. 2010)).

## II.   Aetna's Decision to Deny Jalowiec's Claim for LTD Benefits

### A.   Aetna's Classification of Jalowiec's Occupation

#### 1.   Interpretation of "your own occupation"

Aetna argues that its interpretation of the phrase "your own occupation" in the

LTD Plan to refer to Jalowiec's occupation as it exists in the national economy was

reasonable and should be upheld.  (Doc. No. 24 at 21 (citing *Darvell v. Life Ins. Co. of*

*N. Am.*, 597 F.3d 929 (8th Cir. 2010)).)  In response, Jalowiec argues that the plan does

not define "occupation," unlike plans which specifically define the term according to "the

national economy or general workplace."  (*See* Doc. No. 29 at 28 & n.11 (citing *Frerichs*

*v. Hartford Life & Acc. Ins. Co.*, 875 F. Supp. 2d 923, 945 (D. Minn. 2012)); *see also*

Doc. No. 35 at 21-22 (identifying recent cases in which Aetna's own policies specify that

the insured's occupation will be determined based on how it is performed in the national

economy).)  Jalowiec also contends that a plain meaning of the phrase "your own" and

dictionary definitions of "occupation" establish that the plan refers to Jalowiec's specific

position.  (Doc. No. 29 at 38.)  Jalowiec argues that under the terms of the LTD Plan,

"Jalowiec is totally disabled if he could not perform at least one of the material duties of

his job as DDC Supervisor for Team Industries." (*Id.* at 21.)  Thus, Jalowiec argues, Aetna should have considered Jalowiec's actual position rather than a more generalized description of Jalowiec's occupation in the national economy.  (*Id.*)

Beyond the LTD Plan's language itself, Jalowiec also points to Aetna's claim notes to suggest that Aetna's own employees considered the "your own occupation" language to refer to Jalowiec's own position.  (Doc. No. 29 at 38.)  Specifically, Jalowiec cites claim notes referring to Jalowiec's "Own Occ w/Own Employer."  (*Id.*)  In contrast, Aetna suggests that its employee specifically notified Jalowiec that "Aetna insures the occupation, not the job."  (Doc. No. 24 (citing AR at 314).)  However, Jalowiec points out, this interpretation was never communicated to Jalowiec during the administrative review process.  (*See* Doc. No. 35 at 18.)  And in particular, Aetna's denial letters specifically referred to "your own occupation of DDC supervisor" rather than a more generic occupation description.  (Doc. No. 35 at 19 (citing AR at 151, 158).)  Applying the *Finley* five-factor test, Jalowiec argues Aetna's interpretation of the phrase "your own occupation" was not reasonable.  (Doc. No. 35 at 19-22.)

Under a deferential abuse-of-discretion standard, the Court finds Aetna's interpretation of the phrase "your own occupation" in the LTD Plan to be reasonable.  In assessing the reasonableness of Aetna's interpretation of the plan, the Court must consider five factors:  (1) whether the interpretation is consistent with the goals of the plan; (2) whether it renders any language in the plan meaningless or inconsistent; (3) whether it conflicts with the requirements of ERISA; (4) whether the administrator has interpreted the words at issue consistently; and (5) whether the interpretation is

contrary to the clear language of the plan.  *See Brake v. Hutchinson Tech., Inc.*, 774 F.3d 1193, 1197 (8th Cir. 2014) (citing *Finley v. Special Agents Mut. Benefit Ass'n, Inc.*, 957 F.2d 617, 621 (8th Cir. 1992)).  Ultimately, the Court "must defer to [Aetna's] interpretation of the plan so long as it is reasonable, even if the court would interpret the language differently as an original matter."  *Darvell v. Life Ins. Co. of N. Am.*, 597 F.3d 929, 935 (8th Cir. 2010) (internal quotation marks and citation omitted).

The LTD Plan's definition of total disability includes the pertinent language in dispute:  "You are deemed to be totally disabled if you are not able, solely because of injury or disease, to perform the material duties of your own occupation. . . ."  (PD at 3.)  The LTD Plan further states:  "You will not be deemed to be performing the material duties of your own occupation . . . if . . . you are performing at least one, but not all, of the material duties of your own occupation. . . ."  (*Id.*)  The Plan does not contain a definition of "your own occupation."

In *Darvell*, the Eighth Circuit addressed the reasonableness of an insurer's interpretation of very similar plan language.  The plan at issue in *Darvell* defined disabled, in part, as "unable to perform all the material duties of his or her regular occupation. . . ."  *Darvell*, 597 F.3d at 933.  The Plan did not define "regular occupation." *Id.* at 935.  Focusing on the clear language of the plan, the Eighth Circuit upheld the insurer's interpretation that "regular occupation" meant a claimant's occupation as defined by the Dictionary of Occupational Titles ("DOT") rather than his or her particular job.  *Id.* at 934-36.  The court explained that "[t]he phrase 'material duties of his . . . regular occupation' can be interpreted to refer to [the claimant's] generic occupation,

rather than his specific position." *Id.* at 936.  Because the claimant did not suggest any other *Finley* factors weighed against upholding the insurer's interpretation, the court declined to find it unreasonable.  *Id.*  The clear language of the LTD Plan in this case is nearly identical to that in *Darvell*, and the Court finds Aetna's interpretation of the policy to be reasonable.  As the Eighth Circuit discussed in *Darvell* with respect to the phrase "his or her regular occupation," the phrase "your own occupation" could be construed to refer to a claimant's generic occupation or his or her specific job duties.  *See id.*  The Court does not find that the plain meaning of the words "your own" are substantially different from the words "his or her regular" such that *Darvell* can be readily distinguished.  Because the plan language is open to more than one reasonable interpretation, the Court will not disturb Aetna's reasonable interpretation in this case.

The Court notes Jalowiec's arguments relating to Aetna's purported inconsistency in interpreting this plan language throughout the claim administration process.  As Jalowiec suggests, Aetna's claim notes could be read to suggest that Aetna was seeking information about Jalowiec's own employment at Team Industries.  However, the evidence can also be read to support Aetna's interpretation of the policy.  For instance, Aetna's vocational reviewer, Crate, considered Jalowiec's specific job duties in his analysis of Jalowiec's job.  However, he also conducted a DOT look-up to classify Jalowiec's occupation as it exists in the national economy.  In a subsequent denial letter, Aetna relied on the results of the DOT look-up in considering Jalowiec's job to be "light physical demand."  (*See* AR at 151, 578.)  The Court finds that there is insufficient

41

evidence of inconsistent interpretation to conclude that Aetna's interpretation of the plan was unreasonable in this case.

The Court concludes that Aetna reasonably interpreted the LTD Plan to require consideration of Jalowiec's generic occupation as it exists in the national economy.

### 2.    Vocational Review Process

With respect to the classification of Jalowiec's position throughout the claim administration process, Jalowiec suggests Aetna abused its discretion by "flip-flopping" between categories at varying stages in the claim process and failing to identify its vocational expert which purportedly deprived Jalowiec of a full and fair review. (Doc. No. 29 at 37, 42-44; Doc. No. 35 at 26.) In reply, Aetna suggests that it reevaluated Jalowiec's occupation in order to provide a *de novo* review during the appeal process and argues that it did not deny Jalowiec a full and fair review of his claim. (Doc. No. 34 at 26-27.) Specifically, Aetna argues that it conducted a second vocational review based on the initial reviewer's statement that certain aspects of Jalowiec's job description needed to be clarified. (Doc. No. 24 at 22.) Aetna also argues that its interpretation of Jalowiec's occupation was reasonable "because it is entirely consistent with evidence of duties Plaintiff actually performed, as well as Plaintiff's own description of his occupation." (*Id.* at 23.) In particular, Aetna notes that Jalowiec's "material duties" should be considered the core duties that he actually performed rather than all duties listed on a job description. (Doc. No. 34 at 25.) Jalowiec challenges Aetna's classification of Jalowiec's occupation as contrary to the available evidence regarding Jalowiec's position. (Doc. No. 29 at 39.)

The Court concludes Aetna abused its discretion in classifying Jalowiec's occupation because the classification of Jalowiec's occupation as sedentary was not supported by substantial evidence. Aetna classified Jalowiec's job on three different occasions. In denying Jalowiec's claim for STD benefits, Aetna classified Jalowiec's job as sedentary. In the initial stage of Jalowiec's LTD claim, Aetna classified Jalowiec's job as light physical demand based on Crate's vocational review. Crate specifically noted the previous classification of sedentary and rejected this classification based on a thorough review of Jalowiec's job description. Instead, Crate recommended either a light or medium duty classification.[4] During Jalowiec's appeal of Aetna's LTD determination, Aetna had an additional vocational review conducted by Wolfinger who concluded Jalowiec's occupation should be classified as sedentary. Based on this review, Aetna returned to its original position that Jalowiec's position should be considered sedentary. Aetna's letter to Jalowiec's attorney communicating the results of the LTD appeal did not mention Wolfinger's new vocational review and did not identify Aetna's new classification of Jalowiec's position as sedentary. When Jalowiec subsequently learned

---

[4]     Crate's notes draw a distinction between Jalowiec's "job" and his "occupation" and provide corresponding classifications for each. For example, after describing Jalowiec's job description, Crate concludes "[t]he job appears to be MEDIUM with an estimated SVP of 7." (AR at 578.) Crate then goes on to identify corresponding generic occupations to which Jalowiec's job correlated. Crate states that the "job appears to be a LIGHT occupation with an SVP of 7 or 8 in the national economy." (*Id.*) Aetna apparently relied on Crate's classification of Jalowiec's "occupation" based on its classification of Jalowiec's position as "light physical demand" in its March 7, 2013 denial letter. (AR at 151.)

of this classification and sought to challenge Aetna's decision, Aetna stated that Jalowiec

had exhausted his administrative appeals.

Aetna's decision to return to its original classification of Jalowiec's occupation as

sedentary was not supported by substantial evidence.  Notably, Crate's vocational review

notes rejected the original classification during the STD process that Jalowiec's

occupation was sedentary.[5]  To evaluate the proper occupational category for Jalowiec's

position at Team Industries, Aetna had access to Jalowiec's job description, the letter

submitted by his employer on appeal, and Jalowiec's own description of his job duties

communicated during an interview with Aetna and in a Work History questionnaire.

Jalowiec's job description explained that Jalowiec was required to frequently lift up to

25 pounds and occasionally lift up to 50 pounds.  He was also required to travel for

conferences, conduct presentations, and consult with employees at various workstations

to resolve problems on a daily basis.  Jalowiec described his position as "mostly a

sedentary occ[upation] with some lifting,"  (AR at 581) but "no heavy lifting" (AR at

406).  He indicated his position included up to eight hours per day of sitting, one hour per

day of walking, and one hour per day of standing.  Jalowiec reported that on the job he

was occasionally required to bend/stoop, crawl, reach above his shoulders, kneel,

---

[5]      Although Crate's notes indicate that he would review the classification of
Jalowiec's occupation based on whether Jalowiec was actually required to frequently ride
ATVs and other recreational vehicles, there was no indication that subsequent analysis
could possibly result in a sedentary classification.  On the contrary, Crate indicated that if
these requirements were taken into account, Jalowiec's job would be heavy and his
occupation would be light.

push/pull, and lift up to 50 pounds or more.  He also explained that riding ATVs and snowmobiles was not something he was required to do regularly as part of his job.

As noted above, during Crate's vocational review, he rejected the prior improper classification of Jalowiec's position as sedentary based on Jalowiec's job description which included, among other things, lifting, effectively presenting information to teams, and traveling occasionally.  In contrast with Crate's detailed review, Wolfinger's review during the appeal process included virtually no analysis or explanation to justify the sedentary classification of Jalowiec's occupation.  The additional information Jalowiec provided about his employment on appeal included a letter from his employer identifying several non-sedentary duties.  In her review, Wolfinger simply noted that she reviewed Jalowiec's job description for his position as a DDC Supervisor and completed a DOT look-up.

Although Aetna reasonably interpreted the LTD Plan to require consideration of Jalowiec's position as it existed in the national economy, it had a duty to properly categorize Jalowiec's occupation based on the evidence available.  *See Waldoch*, 757 F.3d at 833 ("[A]n administrator cannot simply ignore relevant evidence or arbitrarily refuse to credit a claimant's reliable evidence." (internal quotation marks and citation omitted)).  Because the evidence suggests that Jalowiec's position included at least some lifting, standing one hour per day, walking one hour per day, and overseeing employees at various workstations, it was unreasonable for Aetna to rely on Wolfinger's revised

classification that Jalowiec's occupation was sedentary.[6] Thus, the Court concludes

Aetna abused its discretion in relying on Wolfinger's sedentary classification in

upholding its decision to deny LTD benefits.

### B.    Aetna's Reliance on Independent Medical Reviews

Jalowiec also argues that Aetna abused its discretion by improperly relying upon

its three independent reviewers' opinions because the reviewers were not qualified to

review Jalowiec's condition, were provided incorrect information from Aetna, did not

personally examine Jalowiec, and did not contact his treating physicians for peer-to-peer

consultation.  (Doc. No. 29 at 30-32, 34-35.)  Specifically, Jalowiec contends Aetna

violated ERISA regulations by relying on independent reviewers who did not have

appropriate training or experience in the field necessary to give a medical judgment.  (*Id.*

at 29-30.)  In response, Aetna contends that claim administrators have no duty to credit a

treating physician's opinion over the conflicting opinions of its own reviewers.  (Doc.

No. 34 at 18.)  Aetna also argues it had no duty to conduct an independent medical

examination of Jalowiec because "[Jalowiec's] complete medical records were reviewed

by doctors, registered nurses, as well as independent physicians who were uniquely

---

[6]     The parties dispute which duties should be deemed "material" duties of Jalowiec's own occupation in evaluating his disability claim.  Aetna argues that Jalowiec's "material duties" should be the core duties he actually performed rather than all of his duties listed on a job description.  (Doc. No. 34 at 25.)  The Court does not need to resolve this dispute, however, because even Jalowiec's core duties that he actually performed suggest that Aetna's sedentary classification was unreasonable.

qualified to review and provide insight on [his] functional impairments, if any." (*Id.* at 19.)

The Court concludes that Aetna abused its discretion in relying heavily on its three independent reviewers' opinions in concluding that Jalowiec was not disabled under the terms of the LTD Plan. The Supreme Court has held that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). Indeed, an insurer "may rely upon the reports of consulting, non-examining physicians over the reports of treating physicians." *Carrow*, 664 F.3d at 1259 (citing *Weidner v. Fed. Express Corp.*, 492 F.3d 925, 930 (8th Cir. 2007)). However, in reviewing Aetna's reliance on the independent reviewers' reports under an abuse-of-discretion standard, the Court "may consider both the quantity and quality of evidence" available to Aetna. *Wise*, 429 F.3d at 1190 (citation omitted). Applying these principles, the Court concludes Aetna abused its discretion.

First, the independent reviewers based their opinions on incorrect or incomplete information about Jalowiec's claim. All three reviewers based their opinions on Aetna's improper determination that Jalowiec's occupation should be classified as sedentary. Dr. Eaton made a particular recommendation based on this classification, suggesting "[Jalowiec] would be capable of performing his own sedentary level occupation." (AR at 891.) He recommended that Jalowiec should be limited to occasionally exerting up to

ten pounds of force and/or frequently exerting up to a negligible amount of force.  The

other reviewers did not specify how the sedentary classification affected their analysis, so

it is not clear whether their recommendations would have been the same had Jalowiec's

position been properly classified.  Along with this overriding flaw, Dr. Alpers also noted

that some of the records available for review were not legible.  Again, it is not clear

whether this problem influenced the other reviewers' opinions as well, but it suggests a

limitation in the independent review process.  These facts taint the quality of the

independent reviewers' reports and suggest Aetna was not reasonable in relying so

heavily on them.

Second, none of the three reviewers had the proper expertise to review Jalowiec's

diagnosis at the time of appeal which was noted on all three reports as "UNSPECIFIED

DISORDER OF AUTONOMIC NERVOUS SYSTEM."  (AR at 882, 889, 902.)  ERISA

regulations outlining the requirements for a full and fair review of a participant's claim

on appeal provide that "the appropriate named fiduciary shall consult with a health care

professional who has appropriate training and experience in the field of medicine

involved in the medical judgment."  29 C.F.R. § 2560.503-1(h)(3)(iii); *id.*

§ 2650.503-1(h)(4).  The Eighth Circuit has noted that "the administrator's use of an in-

house physician rather than a specialist to review a disability claim involving an

uncommon disease can be a serious procedural irregularity affecting the administrator's

decision."  *Morgan v. UNUM Life Ins. Co. of Am.*, 346 F.3d 1173, 1177 (8th Cir. 2003).

In *Morgan*, the court found that the insurer's decision to deny benefits was not supported

by substantial evidence, in part because "[n]othing in the record show[ed] that [the

insurer's in-house physician] had any expertise or experience whatsoever in dealing with [the claimant's disease]." *Id.* at 1177-78.[7] The record in this case supports a similar conclusion.

Aetna referred Jalowiec's claim to Dr. Schnur (a psychologist), Dr. Alpers (a neurologist with expertise in electrodiagnostic medicine), and Dr. Eaton (a cardiologist). Dr. Schnur did not review Jalowiec's physical complaints because they were beyond the scope of his expertise. He limited his review to cognitive, emotional, and behavior limitations. Dr. Alpers discussed Jalowiec's headaches from a neurological perspective, but indicated that he could not evaluate Jalowiec's more recent POTS diagnosis or his associated impairments of dizziness and visual symptoms because he considered POTS to be a "cardiac (non-neurological) condition." (AR at 885.) Dr. Alpers did discuss Dr. Benditt's position that Jalowiec was suffering from an autonomic dysfunction disorder, but it is unclear whether Dr. Alpers had any relevant expertise to evaluate this condition. In addition, Dr. Alpers reiterated that most of the restrictions and limitations imposed by Jalowiec's physicians were for non-neurological conditions which were "beyond the scope of a neurology review." (*Id.*) Finally, Dr. Eaton's review was also tainted by a lack of expertise to properly review Jalowiec's condition. Dr. Eaton noted

---

[7]     The Court finds *Morgan* to be persuasive, notwithstanding the fact that the reviewing physician in *Morgan* was an in-house physician rather than an independent reviewer. The expertise of an independent reviewer not only affects whether an the appeal affords a claimant a full and fair review under ERISA regulations, *see* 29 C.F.R. § 2560.503-1(h)(3)(iii), but also illustrates the quality of the evidence upon which the insurer based its decision, *see Wise*, 429 F.3d at 1190.

Dr. Benditt's opinion that Jalowiec's symptoms were "related to 'a primary neurologic disease. . . .'" (AR at 891.) However, he reviewed Jalowiec's file from a cardiological perspective and concluded it was not clear if Jalowiec actually had a cardiovascular disease. Jalowiec's disease progressed through many stages and possible diagnoses over several years, and even his own treating physicians had difficulty diagnosing and treating his symptoms. Thus, it was all the more important that Aetna rely on the opinions of a qualified medical expert with "appropriate training and experience in the field of medicine involved in the medical judgment." *See* 29 C.F.R. § 2560.503-1(h)(3)(iii). Because it failed to identify any such medical professionals to review Jalowiec's claim, Aetna's significant reliance on its three independent reviewers' opinions was an abuse of discretion.

Third, the reviewers' opinions and Aetna's reliance upon those opinions were not based upon informed consultation with Jalowiec's own treating physicians. In a recent case, the Eighth Circuit Court of Appeals found that an insurer had not abused its discretion in denying long-term disability benefits, based in part on the fact that the claimant's physician agreed with the independent expert's conclusions. *Johnson*, 775 F.3d at 989. In concluding, the Eighth Circuit explained: "Perhaps most telling is that United submitted Dr. Boscardin's findings to Dr. McClellan . . . who responded, 'Overall, I agree with Dr. Boscardin's opinion.'" *Id.* Insurers or their independent experts have no affirmative duty to seek consultation with treating physicians, but whether an insurer did so is a relevant factor to weigh in assessing the overall quality of the evidence upon which the insurer based its decision.

Although Dr. Alpers was able to reach Dr. Winjum for peer-to-peer consultation, neither Dr. Schnur nor Dr. Eaton consulted with any of Jalowiec's treating physicians. Dr. Alpers also sought to reach Dr. Tulloch but did not reach him on the two occasions he attempted to contact him just days before completing his own report.  Dr. Eaton attempted to contact Dr. Karim by leaving messages on two days, but he issued his report on the second day prior to hearing from Dr. Karim.  Aetna sent Dr. Alpers's report to Dr. Tulloch and sent Dr. Eaton's report to Dr. Karim for response, but neither was able to respond in the time available prior to Aetna's final decision.  Notably, although Dr. Hauge, Dr. Linzer, and Dr. Benditt had all opined that Jalowiec should be considered disabled or may be unable to work, neither Aetna nor any of the independent reviewers attempted to contact these treating specialists for peer review.  In *Johnson*, the reviewing physician's report was reviewed by the claimant's treating physician who ultimately agreed with the reviewer's opinion.  *See id.*  Here, Jalowiec's doctors were given scant, if any, opportunity to respond to the external reviewers' conclusions.  What is more, the reports were not sent for review to the specialist who would most likely be in the best position to accurately and fully review those opinions—Dr. Benditt who had most recently diagnosed Jalowiec with an autonomic dysfunction condition based on his symptoms.[8]  As noted above, Jalowiec's condition presented diagnostic challenges even

---

[8]     Dr. Benditt not only had the most recent contact with Jalowiec regarding his autonomic dysfunction, but also appears to have had the most relevant expertise to understand Jalowiec's condition.  As noted in Dr. Benditt's biography submitted to Aetna on appeal, he is a specialist in cardiac electrophysiology who "pioneered the addition of

(Footnote Continued on Next Page)

for his own treating physicians.  The independent reviewers' failure to gather input from Jalowiec's treating specialists—particularly Dr. Benditt—significantly diminishes the quality of their reports and renders Aetna's blind reliance thereon to be an abuse of discretion.

### C.     Substantial Evidence

Ultimately, the Court's assessment of Aetna's decision must be based on whether it was supported by substantial evidence which means "more than a scintilla but less than a preponderance."  *Waldoch*, 757 F.3d at 832 (quoting *Midgett*, 561 F.3d at 897) (internal quotation marks omitted).  Aetna argues that its decision to deny LTD benefits should be upheld because substantial evidence in the administrative record supported its decision. (Doc. No. 24 at 2.)  Aetna emphasizes that it was Jalowiec's burden to prove that he was entitled to benefits and asserts that Jalowiec has failed to meet that burden "because the contemporaneous medical evidence shows that [Jalowiec] is not disabled from performing his own occupation."  (*Id.* at 16.)  Aetna claims that there was "no evidence to support Plaintiff's diagnosis of POTS syndrome . . . or that he was functionally impaired by any other condition."  (*Id.* at 17.)  Jalowiec argues that "Aetna disregarded the plethora of medical evidence [he] submitted in support of his claim, including

_____

(Footnote Continued From Previous Page)

tilt-table testing to clinical practice."  (*See* AR at 1376 ("Today, Dr. Benditt's principal research interests involve the evaluation of syncope and related autonomic disturbances. His clinical practice serves all adult cardiac electrophysiology patients, including those with syncope and arrhythmias.").)

recommendations by multiple treating specialists that [he] is unable to work" and instead improperly relied upon its three independent reviewers.  (Doc. No. 29 at 2-3.)  In particular, Jalowiec challenges Aetna's reliance on the fact that many of his symptoms were "subjective and self-reported."  (*Id.* at 32.)  Aetna responds that "it was reasonable for Aetna to require medical evidence to support [Jalowiec's] claim and to determine whether the medical evidence provided satisfied [his] burden to provide proof of the nature and extent of his alleged loss and claim of total disability."  (Doc. No. 34 at 12.)  Jalowiec argues that despite any lack of clarity over the specific cause of his condition, "the undisputed medical evidence clearly shows that [he] is suffering from debilitating symptoms that render him disabled under the terms of the LTD plan."  (Doc. No. 35 at 39.)

Along with being qualitatively flawed as explained above, the Court concludes that the independent reviewers' reports did not provide Aetna with substantial evidence upon which to base its decision to deny Jalowiec's LTD claim.  Further, despite Aetna's suggestion that Jalowiec's symptoms are largely self-reported, the Court finds that Jalowiec's medical history contained several objective findings to substantiate Jalowiec's claims.  By improperly relying on the flawed conclusions of its independent reviewers and disregarding reliable objective evidence, Aetna reached a decision that was not supported by substantial evidence.  Therefore, Aetna abused its discretion.

An insurer is "not free to accept [an independent reviewer's] report without considering whether its conclusions follow logically from the underlying medical evidence."  *Willcox v. Liberty Life Assurance Co. of Boston*, 552 F.3d 693, 700-01 (8th

Cir. 2009) (quoting *Abram v. Cargill, Inc.*, 395 F.3d 882, 887 (8th Cir. 2005)).  And it is an abuse of discretion for an insurer to rely on an independent reviewer's report that reflects an "incomplete, selective review of the medical evidence."  *Id.* at 702.  The Eighth Circuit has found no abuse of discretion based on an insurer's reliance on peer reviews when "the peer reviews . . . viewed together . . . accurately represent[ed] [the claimant's] medical record and adequately address[ed] the evidence supporting her claim for disability."  *Midgett*, 561 F.3d at 898.  However, "an administrator may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician.  Moreover, eliminating one potential cause of a claimant's disability may be insufficient to deny a claim if the symptoms are otherwise credible and other potential causes exist."  *Willcox*, 552 F.3d at 701 (internal quotation marks and citations omitted). "Where there is a conflict of opinion between a claimant's treating physicians and the plan administrator's reviewing physicians, the plan administrator has discretion to find that the employee is not disabled."  *Coker v. Metropolitan Life Ins. Co.*, 281 F.3d 793, 799 (8th Cir. 2002).  However, this is not the case where "the administrative decision lacks support in the record, or . . . the evidence in support of the decision does not ring true and is . . . overwhelmed by contrary evidence."  *Id.*  (quoting *Donaho v. FMC Corp.*, 74 F.3d 894, 901 (8th Cir. 1996)); *see also Dillard's Inc. v. Liberty Life Assurance Co. of Boston*, 456 F.3d 894, 899-900 (8th Cir. 2006) ("[A] plan administrator has discretion to deny benefits based upon its acceptance of the opinions of reviewing physicians over the conflicting opinions of the claimant's treating physicians unless the record does not support the denial." (citations omitted)).

Further "[i]t is not unreasonable for a plan administrator to deny benefits based upon a lack of objective evidence." *Jackson v. Prudential Ins. Co. of Am.*, 530 F.3d 696, 701 (8th Cir. 2008) (quoting *Groves v. Metro Life Ins. Co.*, 438 F.3d 872, 875 (8th Cir. 2006)).  However, "a plan administrator may not deny benefits simply because a claimant cannot provide a diagnosis that would explain her self-reported symptoms." *Collins v. Cont'l Cas. Co.*, 87 F. App'x 605, 606 (8th Cir. 2004) (citation omitted).  "[An insurer's] obligation as an ERISA fiduciary require[s] more than combing the record for evidence in its favor and abandoning its review upon discovering more than a scintilla of such evidence.  [The insurer is] required to evaluate the available evidence in its entirety before reaching a determination. . ." *Willcox*, 552 F.3d at 702 (internal quotation marks and citation omitted).

In its October 10, 2013 letter denying Jalowiec's LTD claim on appeal, Aetna reviewed Jalowiec's medical history largely through the lens of its three independent reviewers.  In rejecting the relevance of Dr. Hauge's neuropsychological evaluation, Aetna adopted Dr. Schnur's position that "[a] mild liability in working memory and processing speed as well as cognitive inefficiency would not necessarily preclude [Jalowiec] from performing his own occupation."  (AR at 779.)  However, Aetna's letter did not reference the fact that Hauge's evaluation involved the administration of thirteen tests which resulted in several objective measures to quantify Jalowiec's cognitive abilities.  Jalowiec's working memory and processing speed were established to be at the 55th percentile.  On the Wisconsin Card Sorting Test, Jalowiec's "[a]bstraction, problem solving, and the ability to benefit from error corrected feedback . . . show[ed] mild and

noticeable inefficiency." (AR at 381-82.) Dr. Hauge noted that Jalowiec's overall

conceptual responding fell at the 19th percentile and was "outside the range of what [one]

would anticipate given [Jalowiec's] age, education and life experience." (AR at 381-82.)

The "self-reported symptoms" Dr. Hauge noted were those related to the Beck

Depression Inventory—not the objective findings of Dr. Hauge's other cognitive tests.

(AR at 382.) It was not reasonable for Aetna to rely heavily on Dr. Schnur's conclusory

opinion regarding Dr. Hauge's results while ignoring the objective findings from

Dr. Hauge's neuropsychological examination.[9]

Aetna also noted the normal MRI, MRA, and MRV results obtained at the

Diamond Headache Clinic and noted that there was no clinically significant valvular

heart disease. However, Aetna did not elaborate on how these findings bear on its

analysis of Jalowiec's autonomic dysfunction diagnosis which was the basis for his

disability claim on appeal. Citing this medical evidence, without elaborating on its

relevance for Aetna's review of Jalowiec's claim, illustrates Aetna's selective and

incomplete review of Jalowiec's medical history.

Dr. Eaton's review was also an unreasonable source of evidence on which Aetna

based its denial of Jalowiec's claim. After describing the results of Jalowiec's tilt-table

test as positive for POTS, Aetna parrots Dr. Eaton's conclusion that "the review of the

---

[9]     Jalowiec notes that Aetna never requested the raw data from Dr. Hauge's
examination. (Doc. No. 29 at 17.) Aetna similarly indicates that Jalowiec never provided
such data to Aetna. (Doc. No. 34 at 3.) The Court does not find the absence of such data
to be relevant because Dr. Hauge's examination report identifies several objective
findings which alone constitute credible evidence to support Jalowiec's claim.

medical records do not indicate clinical findings consistent with unstable angina pectoris, decompensated congestive heart failure, syncope/near syncope or clinically significant cardiac arrhythmia supporting a functional impairment that would prevent Mr. Jalowiec from performing the material duties of his own occupation." (AR at 779.) Relying on this analysis, Aetna ignores the relevant medical evidence in support of POTS or a related condition to conclude that Jalowiec does not have several heart conditions that he never claimed to suffer from. Further, at least one of these conclusions conflicts with the medical evidence. Contrary to Aetna's statement that the medical records do not support a finding of syncope/near syncope that would preclude Jalowiec from working, Dr. Karim's tilt-table test results specifically indicated "patient started having severe nausea with feeling severe lightheadedness and felt pre-syncopal." (AR at 925.) The tilt-table test—an objective measure of Jalowiec's condition—demonstrated that Jalowiec's heart rate rose immediately when he was tilted.[10] Similarly, Dr. Linzer opined that Jalowiec "should not drive given his episodes of near syncope" and reported that Jalowiec's "[h]eart rate goes up with standing." (AR at 914.)

Aetna also relied improperly on Dr. Alpers's review to reject the credible findings and objective evidence provided by Dr. Benditt and Dr. Tulloch. After describing Dr. Benditt's finding that Jalowiec was unable to stand for more than a few minutes without falling based on an autonomic dysfunction disorder and the abnormal results of

---

[10]     Dr. Karim reported the following as an "objective finding" on an Attending Physician Statement submitted to Aetna: "Postural increase in heart rate with upright posture as documented on tilt table testing." (AR at 962.)

Dr. Tulloch's biopsy, Aetna discredits these findings by repeating—almost word-for-word—Dr. Alpers's conclusion that "[Jalowiec's] self-reported symptoms such as weakness, pain, GI symptoms and tremulousness, are considered self-reported in nature [and] provide very little evidence associated with clinical abnormalities." (AR at 779-80.)  Aetna also adopts Dr. Alpers's position that although Dr. Tulloch's biopsy results "may signal a more widespread small-fiber neuropathy," the findings are "of questionable clinical relevance." (AR at 780.)  Finally, Aetna noted Jalowiec's postural symptoms but repeated Dr. Alpers's position that "the provided medical records do not indicate associated symptoms of small-fiber dysfunction such as sensory loss, allodynia or sudomotor dysfunction." (*Id.*)  Aetna failed to explain how these conclusions supported its ultimate opinion that Jalowiec is not disabled from his occupation under the terms of the LTD Plan.  Aetna also noted the results of Dr. Alpers's conference call with Dr. Winjum, Jalowiec's primary care physician.  Aetna discussed Dr. Winjum's opinion that Jalowiec's headaches are not a continuing source of functional impairment and noted Dr. Winjum's statement that Jalowiec was now wheelchair-bound due to his postural symptoms.  Aetna explained that Dr. Alpers did not reach Dr. Tulloch for consultation.  As noted above, Dr. Alpers qualified his review by noting that most of Jalowiec's restrictions and limitations were for non-neurological indications beyond the scope of his neurological review.  His report, therefore, should not be considered substantial evidence on which Aetna could base its decision.  Aetna's extensive reliance on Dr. Alpers's report over the conflicting opinions of Jalowiec's own treating specialist physicians was not reasonable and was an abuse of discretion.

Aetna ultimately concluded that "[b]ased upon [its] review of the information

[Jalowiec] provided, . . . there was a lack of medical evidence . . . supporting a functional

impairment that would have prevented [him] from performing the material duties of his

own occupation. . ." (AR at 780.)  The Court finds this conclusion to be unreasonable

and an abuse of discretion.  This is not a case where the claimant's "subjective,

uncorroborated complaints of pain constituted the only evidence of [his] ailments."

*Johnson v. Metro. Life Ins. Co.*, 437 F.3d 809, 814 (8th Cir. 2006).  Nor was there any

evidence that any of Jalowiec's treating physicians "suspected that [he] was exaggerating

[his] symptoms in an attempt to qualify for long-term disability benefits." *Id.*  Neither is

this a case where the claimant submitted "only subjective medical opinions, which are

unsupported by objective medical evidence, such as the results of diagnostic tests."

*Coker*, 281 F.3d at 799.  Dr. Hauge's neuropsychological examination, Dr. Karim's

tilt-table testing, and Dr. Tulloch's biopsy results all constitute objective evidence to

corroborate Jalowiec's symptoms of headaches, cognitive difficulty, dizziness, and an

inability to stand without falling to his knees.  Simply because Jalowiec's treating

physicians had difficulty identifying the precise diagnosis for his symptoms does not

render those symptoms irrelevant to an analysis of his disability.  *See Collins*, 87

F. App'x at 607 (noting that "all [treating physicians] agreed that [the claimant]

experienced symptoms to a degree that rendered her unable to work" even though they

"struggled with the proper diagnosis of [her] symptoms").

Apart from Aetna's own characterization of the record in its October 10, 2013

claim denial letter, Jalowiec's medical file tells the story of an individual whose

debilitating symptoms and medical condition prevented him from performing the essential duties of his own occupation.  Beginning in early 2011, Jalowiec experienced headaches and dizziness that caused him to miss several days of work and to present to the emergency room on numerous occasions.  Along with these symptoms, Jalowiec had difficulty thinking and recalling information.  In May 2012, objective neuropsychological testing demonstrated that his executive function fell outside the normal range of a person of his age and education.  An occupational therapy interview in May 2012 also corroborated Jalowiec's symptoms of dizziness, loss of balance, light sensitivity, and increased symptoms with positional changes.  Although a trip to the Diamond Headache Clinic in July 2012 helped to control his headaches, Jalowiec continued to suffer from dizziness and nausea.  He also got weak from standing and fell to his knees when trying to walk.  In December 2012, tilt-table testing provided further objective evidence to corroborate Jalowiec's symptoms.  These symptoms persisted into 2013 when Jalowiec began seeing Dr. Benditt who reported Jalowiec could not "maintain an upright posture for more than a few minutes without loss of vision and subsequent falling."  (AR at 1368.)

Based on these consistent symptoms, multiple treating physicians opined that Jalowiec should be precluded from working or that his symptoms might pose limitations. In May 2012, Dr. Hauge noted, "[a]t this point[,] [h]e is certainly not in a position to be involved in competitive employment."  (AR at 383.)  In November 2012, Dr. Winjum provided his opinion that Jalowiec was functionally impaired from his own occupation. Specifically, he noted that Jalowiec "may be able to work from home, but . . . does not

drive [and] is unsteady." (AR at 1546.) Following tilt-table testing in December 2012,

Dr. Linzer indicated Jalowiec "may not be able to work until symptoms are lessened."

(AR at 914.) In February 2013, Dr. Karim noted that Jalowiec's physical restrictions

would "[d]epend on patient['s] symptoms" and "may need 'formal' assessment." (AR

at 963.) In May 2013, Dr. Benditt opined that "it is not possible for [Jalowiec] to be

productively employed at present and [he] should be considered totally disabled." (AR

at 1368.) In the face of these opinions and the overwhelming evidence of Jalowiec's

disabling symptoms and condition, Aetna concluded Jalowiec was not disabled from his

own occupation based primarily on the opinions of its three independent reviewers.

Aetna's decision was not supported by substantial evidence and was thus an abuse of

discretion.[11]

---

[11]    For the reasons stated above, the Court concludes Aetna abused its discretion in denying Jalowiec's claim for LTD benefits. The Court therefore finds it unnecessary to address Jalowiec's additional arguments regarding Aetna's failure to give the favorable SSA determination appropriate weight (Doc. No. 29. at 21), Aetna's prior determination that Jalowiec was entitled to STD benefits (*id.* at 44), Aetna's structural conflict of interest (Doc. No. 35 at 15-18), or procedural irregularities that purportedly illustrate Aetna's biased review process (*id.* at 17-18). The Court notes that Aetna's conflict of interest did not weigh heavily in the Court's abuse-of-discretion calculation, and the Court would have reached the same conclusion whether or not a conflict existed. "A conflict of interest can 'act as a tiebreaker' when the issue is close and can assume 'great importance' 'where circumstances suggest a higher likelihood that it affected the benefits decision.'" *Jones v. ReliaStar Life Ins. Co.*, 615 F.3d 941, 946 (8th Cir. 2010) (quoting *Glenn*, 554 U.S. at 117) (internal citations omitted). Here, the Court does not find this to be a close case but rather a clear case in Jalowiec's favor. In addition, the Court concludes there is insufficient evidence to suggest Aetna's conflict likely affected its decision. While the Court believes it is clear that Aetna abused its discretion, the Court does not consider Aetna's conflict of interest to be a determinative factor in this case.

### III.    Remedy

At oral argument, the parties disputed what the proper remedy would be if this Court found Aetna abused its discretion in denying Jalowiec's claim.  Aetna argues that the Court should remand the claim to Aetna for reconsideration.  Jalowiec argues that a remand would not be appropriate and instead seeks an award of retroactive and continuing benefits under the LTD Plan.

ERISA contemplates that a court may award benefits to a prevailing plaintiff in a civil action challenging an insurer's denial.  *See* 29 U.S.C. § 1132(a)(1)(B) (providing that a participant or beneficiary may bring a civil action "to recover benefits due to him under the terms of his plan. . .").  At the same time, the Eighth Circuit has explained that the appropriate remedy is a remand for reconsideration when the insurer has violated 29 U.S.C. § 1133(2)'s requirement to provide a full and fair review.  *See Brown v. J.B. Hunt Transp. Servs., Inc.*, 586 F.3d 1079, 1087 (8th Cir. 2009).  Similarly, the Eighth Circuit has held that "[a] reviewing court must remand a case when the court or agency fails to make adequate findings or explain the rationale for its decision." *Abram*, 395 F.3d at 887 (citation omitted).  However, it may be appropriate for the Court to enter judgment in favor of a claimant rather than remanding the claim when the insurer abused its discretion, the claim has been pending for a significant period of time, and "a remand would needlessly delay the already long-delayed benefits payments." *Chronister v. Unum Life Ins. Co. of Am.*, 563 F.3d 773, 777 (8th Cir. 2009) (remanding the case to the district court for entry of judgment in the plaintiff's favor when the benefits claim had been pending for more than a decade).

Because this procedural issue was only raised at oral argument, the Court finds that the parties have not sufficiently briefed this issue to allow the Court to reach a decision one way or the other. The Court believes it to be abundantly clear that Aetna abused its discretion in denying Jalowiec's claim, and the Court notes its concern over the amount of time that has lapsed since Jalowiec's initial claim for benefits. However, the Court is unable to determine the propriety of an award of benefits over a remand or the proper amount of such an award on the record before the Court. And as Aetna pointed out at oral argument, the terms of the LTD Plan change after a claimant has received benefits for twenty-four months. More than twenty-four months have now passed since Jalowiec's initial LTD effective date, and the Court finds it would be improper to award continuing benefits to Jalowiec under these new terms. Given these issues, the Court will consult with the parties to determine the proper remedy in light of this Order, as outlined below.

## IV.    Jalowiec's Request for Fees and Costs

Jalowiec requests an award of attorneys' fees and costs in this matter. (Doc. No. 29 at 46.) "[T]he court in its discretion may allow a reasonable attorney's fee and costs of action to either party" in an ERISA action brought by a beneficiary, participant, or fiduciary. 29 U.S.C. § 1132(g)(1). In exercising such discretion, the Court considers the following factors:

> (1) the degree of culpability or bad faith of the opposing party; (2) the ability of the opposing party to pay attorney fees; (3) whether an award of attorney fees against the opposing party might have a future deterrent effect under similar circumstances; (4) whether the parties requesting attorney fees sought to benefit all participants and beneficiaries of a plan or to

resolve a significant legal question regarding ERISA itself; and (5) the
relative merits of the parties' positions.

*Martin v. Arkansas Blue Cross & Blue Shield*, 299 F.3d 966, 969 n.4 (8th Cir. 2002)

(citing *Lawrence v. Westerhaus*, 749 F.2d 494, 496 (8th Cir. 1984)).  These factors are

not exclusive and should not be mechanically applied.  *Id.* at 972.  The Eighth Circuit has

held that there is no presumption in favor of a fee award for prevailing plaintiffs in

ERISA cases.  *Id.* at 969-72.

In this case, the Court concludes that Jalowiec is entitled to an award of attorneys'

fees and costs.  In particular, the Court finds that such an award will have a beneficial

deterrent effect in preventing Aetna from abusing its discretion in future cases.  Aetna's

heavy reliance on the questionable findings of its independent reviewers led it to reach a

decision that was not supported by substantial evidence.  An award of attorneys' fees

may have the positive effect of encouraging Aetna to more carefully exercise its

discretion in the future to ensure that its decisions are based upon a thorough review of

the claimant's file.  To determine the amount to which Jalowiec is entitled, the Court will

entertain submissions of the parties, including an affidavit from Jalowiec's attorney

outlining the reasonable fees and costs incurred in this matter.  Aetna may also submit a

short letter brief in response to this affidavit, and Jalowiec may submit a reply.

## CONCLUSION

Under the terms of Jalowiec's LTD Plan underwritten by Aetna, Jalowiec was

entitled to LTD benefits if he could prove that he was "totally disabled," meaning "not

able, solely because of injury or disease, to perform the material duties of your own

occupation. . . ." (PD at 3.)  Aetna had discretionary authority to interpret the terms of

the LTD Plan based on explicit discretion-granting language in the group contract

between Aetna and Jalowiec's employer.  Exercising this discretion, Aetna reasonably

interpreted the phrase "your own occupation" to require comparison of Jalowiec's

position at Team Industries to how it is generally performed in the national economy.  In

doing so, however, Aetna abused its discretion by finding Jalowiec's occupation to be

sedentary based on the recommendation of its vocational reviewer on appeal.  Further,

Aetna abused its discretion by relying heavily on the conclusions of its three independent

reviewers to support its LTD decision.  Jalowiec's claim file included consistent evidence

of disabling symptoms, reliable objective evidence to substantiate the presence of those

symptoms, and numerous opinions of treating physicians that Jalowiec should be

considered disabled.  Aetna rejected this evidence in favor of a selective review of the

medical record and unquestioning reliance on its own independent medical reviewers.  In

so doing, Aetna reached a decision that was not supported by substantial evidence.  The

Court concludes Aetna abused its discretion in this matter, and Jalowiec is entitled to an

award of attorney's fees and costs.

## ORDER

Based on the foregoing, and the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.      Plaintiff's Motion for Summary Judgment (Doc. No. [27]) is **GRANTED**

**IN PART** as follows:

a.      Defendant's denial of Plaintiff's claim for long-term

disability benefits is **REVERSED** because it was not supported by

substantial evidence and was an abuse of discretion.

b.      The Court's imposition of a remedy is **RESERVED**.  The

Court will hold a telephone status conference with the parties to discuss the

proper remedy and reserves the right to order supplemental briefing on this

issue.

c.      Plaintiff's request for an award of costs, disbursements, and

other expenses of this litigation, including reasonable attorneys' fees

pursuant to 29 U.S.C. § 1132(g) is **GRANTED**.

2.      Defendant's Motion for Summary Judgment (Doc. No. [23]) is **DENIED**.

3.      As the undersigned stated at the July 17, 2015 hearing, the parties should be

aware that following the issuance of this Order, Brenda Schaffer, Calendar Clerk for the

undersigned, will be contacting counsel regarding next steps in terms of the procedural

posture of this case.

4.      Plaintiff's attorney shall submit an affidavit outlining the reasonable fees

and costs incurred in this matter no later than twenty days following the date of this

Order.  Defendant will have ten days to respond to this affidavit with a short letter brief,

and Plaintiff shall have ten days thereafter to file a short letter brief in reply.

Date:  December 21, 2015                    s/Donovan W. Frank
                                            DONOVAN W. FRANK
                                            United States District Judge